IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
MARSHALL DIVISION

| | | |
|---|---|---|
| JAMES MORROW, and a Proposed | § | |
| Class of other Similarly Situated Persons, | § | |
| Plaintiffs | § | |
| | § | |
| v. | § | CIVIL ACTION NO. 2:08cv288 |
| | § | |
| CITY OF TENAHA DEPUTY CITY | § | JUDGE: T. John Ward |
| MARSHAL BARRY WASHINGTON, | § | |
| *et al.,* | § | |
| Defendants | § | |

## PLAINTIFFS' MOTION FOR CLASS CERTIFICATION

TO THE HONORABLE COURT:

The named Plaintiffs in this case seek certification of a class consisting of similarly

situated persons subject to the Defendants' practices complained of in this lawsuit as described in

the Plaintiffs' Third Amended Complaint (Doc. 111).

### I

### Burden of Proof and Standard of Review

As movants Plaintiffs bear the burden of demonstrating a *prima facie* case that the

prerequisites of Fed.R.Civ.P. 23(a) and the requirements of at least one of the types of class

action described in subpart (b) are met. *Newberg on Class Actions* § 7:17 (4th Ed.). Plaintiffs

anticipate consideration of subpart (b)(2) of Rule 23. Traditionally, a ruling on class certification

is a matter of this Court's discretion subject to review for abuse in recognition of the factual

nature of the inquiry and the court's case management powers. Allison v. Citgo Petroleum

Corp., 151 F.3d 402, 408 (5th Cir. 1998); *see also* Mullen v. Treasure Chest Casino, LLC, 186

F.3d 620, 624 (5th Cir. 1999) ("[W]e note that the district court maintains *great* discretion in

certifying and managing a class action.")(emphasis added).  However, it is clear that the Fifth Circuit carefully scrutinizes *de novo* the legal standards applied.  <u>Allison</u>, *supra*.  While it is recognized that civil rights cases, like this one, alleging ethnic discrimination are often by their nature appropriate class actions, "careful attention to the requirements of F.R.C.P. 23 remains nonetheless indispensable."  <u>East Texas Motor Freight System, Inc. v. Rodriguez</u>, 431 U.S. 395, 405 (1977).  Plaintiffs are fully aware that class certification is a weighty matter.

The 1966 Advisory Committee Note to Rule 23(b)(2) indicates various civil rights actions are illustrative of the type of case appropriate for (b)(2) treatment.  *See also*, <u>Daniels  v. City of New York</u>, 198 F.R.D. 409 (S.D. N.Y. 2001) (discriminatory police stop-and-frisk practices appropriate for (b)(2) class certification).

Rule 23(c)(1)(B) now requires an order certifying a class to include a definition of the class and its claims, issues, or defenses, and to appoint class counsel under subpart (g).  Rule 23(c)(1)(C) explicitly authorizes the Court to alter or amend an order granting or denying class certification before final judgment.

## II

## <u>The Proposed Class</u>

The named Plaintiffs have alleged that they have the following facts in common with members of the proposed class: they were or appeared to be members of an ethnic minority group, or were in the company of somebody who was; they were traveling near Tenaha, Texas during the relevant time period; and they were, or are, subject to being, stopped, detained, arrested, questioned and/or their vehicle searched by one or more of the Defendants, who had no articulable suspicion of criminal activity, to determine whether they (the Plaintiffs and members

of the proposed class) had money or valuable property, and then taking it for their (the

Defendants') use.  *See* ¶ 19 of Plaintiffs' Third Amended Complaint (Doc. 111).  The named

Plaintiffs contend that the Defendants' conduct violated their 4th Amendment right to be free

from unreasonable searches and seizures and their 14th Amendment rights to equal protection and

to due process .  *Id.* ¶ 18.  The evidence described herein substantiates these allegations.  *See* Sec

IV.

At this time Plaintiffs propose the following class definition which is basically that

contained in the Court's Memorandum Opinion and Order of 08/20/2009 (Doc. 86).  Changes

have been made only to reflect evidence of the existence of an interdiction program that began

shortly after the City of Tenaha hired Defendant Washington in November, 2006 (as opposed to

the July 27, 2006, date established by the statute of limitations), and to make explicit that the

proposed class includes people who may in the future be subject to the interdiction program,

making prospective injunctive relief appropriate.  Plaintiffs propose the following class

definition:

People who:

1. are, or appear(ed) to be, members of racial or ethnic minority groups and those in their company, and

2. were, or will be, traveling in, through or near Tenaha at any time after October 2006, and subject to the Defendants' interdiction program,

3. were or are subject to being stopped, detained and/or arrested by one of more of the Defendants without articulable suspicion of criminal activity, and/or

4. were or are questioned and/or their vehicle was or is searched by one or more Defendant, without an articulable suspicion of criminal activity, to find valuable property or money.

3

Of course, the contours of the class are a matter for the Court and are subject to being altered or amended.

### III

### <u>Class Claims</u>

Plaintiffs seek the full measure of equitable relief, including injunctive, declaratory, and to the extent appropriate, monetary relief, permitted by 42 U.S.C. § 1983 and consistent with Rule 23.  Out of an abundance of caution, Plaintiffs also seek the full measure of legal damages, including compensatory and punitive damages.  Anticipated class claims include:

(a)    <u>Class Claims for Declaratory Relief</u>

Under the facts of this case, Plaintiffs request, and anticipate it will be appropriate for the Court to enter, declaratory relief recognizing that:

1.  the Defendants' practice of targeting apparent members of racial or ethnic minority groups for traffic stops, detentions, arrests, searches and seizures violates the equal protection clause of the 14th Amendment

2.  the Defendants' practice of conducting traffic stops, detentions, arrests, searches and seizures without legal justification violates the prohibition against unreasonable searches and seizures in the 4th Amendment, and that resulting forfeitures violate the due process claim of the 14th Amendment.

(b)    <u>Class Claims for Injunctive Relief</u>

Under the facts of this case, Plaintiffs request, and anticipate it will be appropriate for the Court to enter, the following injunctive relief:

1.  a permanent prohibition against the Defendants' practices found to be unconstitutional

2.  a requirement that these Defendants utilize best practices in conducting any traffic stops, roadside detentions, searches and seizures that, at a minimum includes use of video equipment with pre-event recording, or comparable features, so that the legal justification for any traffic stop, detention, warrantless arrest, search and/or seizure is accurately

4

recorded, by video and audio, and meaningful monitoring of all such recordings for constitutional compliance

(c)     Class Claims for Other Equitable, Including Monetary, Relief

Under the facts of this case and to the extent consistent with In re: Monumental Life, 365 F.3d 408, 418-20 (5th Cir. 2004), Plaintiffs request that the Court enter equitable restitution that does not require subjective complex individualized determinations.  The equitable restitution sought would include:

> an order that Defendants return any and all seized property and money, and reimburse class members for their actual readily determinable and foreseeable expenses directly flowing from the Defendants unconstitutional practices complained of, including lawyers' fees, bail expenses, towing and storage fees, and appropriate interest.

(d)     Class Claims for Compensatory and Punitive Damages

Plaintiffs also seek, and do not voluntarily waive, legal compensatory and punitive damages on behalf of the class, under a (b)(2) or (3) certification.  Failure to do so could jeopardize the adequacy of class representatives.  Zachary v. Texas Exploration and Production, Inc., 185 F.R.D. 230, 242-46 (W.D. Tx 1999).  In considering this issue, Plaintiffs direct the Court to Allison v. Citgo, supra, which discusses restrictions on class treatment of claims for compensatory and punitive damages and limitations on the ability of a trial court to certify a hybrid class or use severances to manage the case.  See also Bywaters v. U.S., 196 F.R.D. 458 (E.D. Tx 2000), in which the late Judge Hannah exercised his discretion to certify a (b)(3) class for damages.  Finally, Plaintiffs mention that Duke v. Wal-Mart, 603 F.3d 571, 616-17, 620-23 (9th Cir. 2010), which explicitly conflicts with the Fifth Circuit's treatment of damages in a (b)(2) class, is considered by some likely to be reviewed by the Supreme Court.  Should the Court decide to not certify the class regarding claims for compensatory and/or punitive damages, the

ruling will end the tolling of limitations for such individual claims.  Crown Cork & Seal Co., Inc.

v. Parker, 462 U.S. 345, 353-54 (1983).  Such a ruling may be critical to many class members

who may seek to pursue those claims separately on an individual basis.

IV

**Evidence Relevant to Rule 23 and the Class Definition**

While at the class certification stage it is improper for the court to make any preliminary

determination on the merits, the Court must consider evidence relevant to each requirement of

Rule 23.  Oscar Private Equity Investments v. Allegiance Telecom, Inc., 487 F.3d 261, 268 (5th

Cir. 2007).  Plaintiffs present the following information as it is relevant to the requirements of

Rule 23.

(a)     The Defendants' Interdiction Program - Relevant to the issue of common questions of
        fact (Rule 23(a)(2) ) and Defendants' actions that apply generally to the class (Rule
        23(b)(2) ).

In November 2006 the City of Tenaha hired Defendant Barry Washington to be a deputy

City Marshal.  Washington depo[1] at p. 56, l. 11-14.  Washington had 23 years experience as a

DPS State Trooper during which he received several commendations for interdiction.[2]

Washington depo at p. 13, l. 17-19; p. 23, l. 7-25.  When asked how he went from being a much

decorated career DPS officer to working as a Tenaha (pop. 1046) deputy marshal, Washington

explained in his sworn deposition testimony that one day a bright light came through his

---

[1] References to deposition testimony are referred to as *Plaintiffs' Exhibit 1* (Barry
Washington), *Plaintiffs' Exhibit 2* (Randy Whatley-I:  4/12/10), *Plaintiffs' Exhibit 3* (Randy
Whatley-II: 6/7/10), *Plaintiffs' Exhibit 4* (Fred Walker), *Plaintiffs' Exhibit 5* (George Bowers),
*Plaintiffs' Exhibit 6* (Tracey Strong), *Plaintiffs' Exhibit 7* (Lori Oliver)

[2] Webster's II New College Dictionary first defines interdict as "to forbid or place under
an ecclesiastical or legal sanction."

bedroom ceiling and God told him to go to Tenaha.  Washington depo at p. 43, l. 1-10.

Washington claims God "ordained" him to patrol Highway 59.  Washington depo at p. 55, l. 13-

21.  Washington explained God not only ordained him, but it was God who made Washington an

"interdictor" and gave him a gift - the ability to put crooks in jail, explaining "it's almost like it's

magnetized.  You just don't go past go, you know."  Washington depo at pp. 65, l. 16 - 66, l. 8.

In his deposition Washington referred to God, the Creator, beaming light, dozens of times in

explanation.  Washington depo at pp. 40-47, 51, 54, 56 and 65-66.  Whether Washington's gift

constitutes an articulable suspicion, or is consistent with legal justification, is a likely issue in

this case.

Other evidence suggests Defendants were actually motivated by money, not just spiritual

considerations.  Washington and Mayor Bowers both testified that one of Washington's earlier

interdiction stops that netted the City of Tenaha $20,000, started getting them excited and talking

about an interdiction program.  Washington depo at pp. 62, l. 8 - 64, l. 15; Bowers depo at pp. 41,

l. 3 - 42, l. 18.  Washington explained that a subsequent early stop netting $600,000 is what really

got local law enforcement excited about the interdiction program.  Washington depo at pp. 67, l.

25 - 72, l. 20.  Washington testified, "I think after that particular traffic stop there was an

evolution process here where people realized that, 'Man, there's an astronomical amount of

money out there.' " *Id.* at p. 68, l. 16-19.   In March 2007 Washington submitted a resignation

because he allegedly fulfilled an agreement ahead of schedule and the City Council didn't reward

him with an expected raise.  *Plaintiffs' Exhibit 8.*  Circumstances suggest the raise was to be a

reward or bounty for interdiction seizures.  In December 2007, after the City Council had

determined to eliminate Washington's position due to complaints about his stops, searches and

7

seizures, he was able to get his position reinstated by reminding the City Council that he had met

goals by seizing over $1.2 million.  Bowers depo at p. 61, l. 13-24; pp. 69, l. 7 - 76, l. 16; p. 79, l.

1-13; pp. 80, l. 11 - 81, l. 9; pp. 84, l. 8 - 90, l. 21.

Within a month of Washington's arrival in Tenaha, the City and the Constable Office of

Shelby County Precinct 4 began an interdiction program.  Whatley-I depo at pp. 89, l. 17 - 90, l.

24; pp. 126, l. 1 - 127, l. 8.  Washington depo at pp. 97, l. 23 - 99, l. 2; p. 104, l. 17-23 (He

doesn't disagree with Whatley's description of the interdiction program, but has different

opinions about it).  Defendant Mayor Bowers depo at pp. 40, l. 24 - 41, l. 24.[3]  According to

Whatley the interdiction program just "evolved" without any written record or anybody being in

charge of the program.  *Id.*[4]  According to the Defendants the interdiction program was to stop as

many people as possible, even if that meant *not* taking the time to issue traffic tickets, in an effort

to find other criminal activity.  Whatley-I depo at pp. 122, l. 17 - 123, l. 4. ("[I]f you are writing

lengthy citations on the side of the road, you might be missing a terrorist or criminal going down

the road.") Whatley-I depo at pp. 124, l. 23 - 125, l. 23; p. 127, l. 9-19.  Washington said the

interdiction philosophy was to look beyond the traffic stop for indicators of criminal activity.

Washington depo at p. 73, l. 18-23.  Although the Defendants categorically deny anything about

this interdiction program is illegal, the practices Plaintiffs complain of appear to be included in

what has been described as the Defendants' interdiction program.

---

[3] Bowers was designated by the City to testify pursuant to Rule 30(b)(6).  Bowers depo at pp. 7, l. 22 - 9, l. 16.

[4] Despite this testimony, Defendants District Attorney Lynda K. Russell and her investigator Danny Green did issue some written instructions, reflecting their role in the interdiction program.  *Plaintiffs' Exhibit 9.*  These instructions are dated 3/2/07, shortly after the interdiction program began, "[d]ue to the large number of seizures being filed lately ...".  *Id.*

8

There is considerable dispute as to whether the interdiction stops were based on observed traffic violations.  Such disputes would have been avoided if Whatley and Washington used a "pre-event" feature on their in-car video equipment which could have created a video record of any traffic violations.  Whatley-I depo at pp. 105, l. 7 - 112, l. 2;  p. 140, l. 8-15 (At least before this lawsuit Whatley made no effort to record evidence of the traffic violations he claims as the basis for traffic stops);Washington depo at pp. 130, l. 17 - 132, l. 3 (Washington never even heard of the feature); Walker depo at pp. 17, l. 23 - 23, l. 13 (Tenaha never considered getting such equipment).  City of Tenaha Marshal Fred Walker  testified[5] that initial stops and subsequent detentions and searches may require "probable cause," but he was unable to give any guidelines or substance to the term "probable cause," - it all came down to an "officer's discretion."  Walker depo at pp. 25, l. 4 - 30, l. 1.  He testified that, under the interdiction program there are no limits on the searches that can be performed,  whether to arrest somebody is also up to the officer's discretion, and if somebody is arrested there are no limits on what the officer can seize..  Walker depo at pp. 30, l. 4 - 33, l. 20.  At deposition Washington was asked to explain why he seized, and sought civil forfeiture of, an iPod from one of the named Plaintiffs. He responded that there is no limit on what he can take, "No.  President Reagan says there's no limit."  Washington depo at pp. 238, l. 21 - 239, l. 17.

Marshal Walker was specifically designated by the City to testify about articulable suspicions of criminal activity.  Walker depo at pp. 8, l. 14 - 11, l. 2.  He could not articulate any reason to suspect Plaintiffs Morrow, Flores or Parsons, the proposed class representatives, or

---

[5] The City of Tenaha also designated Walker as a 30(b)(6) witness.  Walker depo at pp. 5, l. 23 - 12, l. 6.

named Plaintiffs Watson, Busby, Dismukes, Dorman or Pearson, were engaged in criminal

activity.  Walker depo at pp. 94, l. 1 - 96, l. 4.  While Walker claimed that named Plaintiffs

Boatright and Henderson had been smoking marijuana, he could not explain why, if that was

true, that they were able to drive off with children in their car after Washington had seized their

money.  Walker depo at pp. 96, l. 5 - 102, l. 11.  Nor could he explain how the $6,000 seized

from them was related to any criminal activity.  *Id.*

 During interdiction stops, once Washington or Whatley determined to seize money or

property and/or arrest a member of proposed class, the officer would call the Shelby County

District Attorney Lynda K. Russell from the side of the road or Constable's office, to reach a

consensus as to how to proceed.  Whatley depo at pp. 163, l. 21 - 168, l. 19.  District Attorney

Russell also had an agreement with the Tenaha Marshal's office and the Constable's office on

what percentage of the seizures the District Attorney would get.  Whatley depo at p. 148, l. 3-21.

 Please note that Defendants Russell and Green have testified at deposition, but the

transcripts are not yet available to be used to support this motion.  Plaintiffs anticipate

supplementing in that regard.  Both of these Defendants merely identified themselves by name

and refused to answer any other questions on the basis of their right not to incriminate

themselves protected by the Fifth Amendment to the United States Constitution and Art. 1, Sec.

10 of the Texas Constitution.  On that basis they refused to describe their roles in the interdiction

program, how they spent the money obtained, or even what schools they went to.

 Shelby County District Clerk Lori Oliver testified that *none* of the named Plaintiffs had

criminal cases filed against them in the Shelby County District Clerk's office.  Oliver depo at p.

36, l. 8-12 (in summary); pp. 10-35 (each named Plaintiff discussed).  Civil forfeiture cases were

filed against all of the named Plaintiffs.  *Id.*  All of the named Plaintiffs who hired counsel (at considerable expense) had their civil forfeiture cases dismissed and money and property returned. *Id.*  Only named Plaintiffs Dorman and Pearson, from whom $4,000 was seized, who did not hire counsel, did not recover the money Defendants seized from them.  *Id.* at pp. 20, l. 21 - 27, l. 12.

The District Clerk also testified that Defendants obtained undated waivers of service and agreed judgments from several of the named Plaintiffs, apparently at the time of the seizures, including Dorman and Pearson (*Id.* at pp. 21, l. 24 - 27, l. 12), Boatright and Henderson (pp. 28, l. 23 - 29, l. 22).[6]  Whatley also testified that all of the citizens caught up in their interdiction program were subject to the same rules and treated the same.  Whatley-I depo at p. 85, l. 8-21.

Tenaha City Marshal Fred Walker was designated by the City pursuant to Rule 30(b)(6) to testify about the interdiction program.  Walker depo at pp. 5, l. 23 - 6, l. 8.  On April 21, 2010 he testified that there had been no changes to the interdiction program and that all citizens were treated according to the same rules under the program.  Walker depo at p. 45, l. 20-24; p. 85, l. 8-12.

(b)     The Morrow stop - Relevant to the issues of typicality (Rule 23(a)(2) ) and adequacy (Rule 23(a)(4) )

James Morrow is an African American, the initial named Plaintiff, and first proposed class representative.  Washington testified that on August 31, 2007 he stopped, detained, questioned, searched the person and car of Plaintiff James Morrow, took $3,969 and two cell phones from him, and arrested him.  Washington depo at p. 169, l. 13-21; Walker depo at pp.

---

[6]  Tx. Code of Crim. Pro. § 59.03(d) prohibits Defendants from obtaining any written waiver of rights at the time of the seizure; § 59.04(b) requires actual service and does not authorize waiver of notice.  While this is rather paltry protection from abuse, the Defendants' practice appears to violate both of these provisions.

11

110, l. 22 - 111, l. 4.[7]  Washington never charged Morrow with any traffic offense to justify the

initial stop, but did charge him with money laundering (Traffic Summons/Notes 29535, MOR

00263, *Plaintiffs' Exhibit 10*).

As mentioned, Marshal Walker was unable to articulate any reason to suspect Morrow of

criminal activity.  Washington attempted to articulate reasons for thinking the money and cell

phones were connected to criminal activity - but his explanations are wholly manufactured,

internally inconsistent, contrary to evidence, and simply do not rationally connect the seized

items to criminal activity.  Washington depo at pp. 169, l. 22 - 193, l. 19.  At first Washington

recites "totality of circumstances" in a conclusory fashion, and claims that Morrow had

conflicting stories and that their were signs of marijuana use.  *Id.*[8]  When it was pointed out that

---

[7] Defendants made video (with audio) recordings of the Morrow stop, beginning
sometime after the initial stop, and of the Flores and Parsons stop.  To the extent the recordings
will help the Court resolve any issues helpful to a class certification ruling, upon the Court's
request the Plaintiffs will tender copies as exhibits.  The Clerk's office has advised that there are
no provisions for Plaintiffs to do so at this time absent directions from the Court.

[8] In both the Morrow and Flores-Parsons stops the Defendants claim one of the totality of
circumstances is that Whatley had a drug dog (K-9, Bo) that "alerted" on the Plaintiffs' cars as
the result of an "open-air sniff".  *Plaintiffs' Exhibit 11*, SC02784, Whatley report on the Flores-
Parsons arrest; *Plaintiffs' Exhibit 12*, MOR 00213, Whatley supplemental report on Morrow
arrest.  The dog may be a piece of the puzzle.  Washington said the dog alerted on the money, as
opposed to drugs.  Washington depo at p. 174, l. 13-14; pp. 241, l. 24 - 242, l. 2.  Whatley
indicated that if the dog was alerting on money, he could be expected to alert on every vehicle
"because the person inside is carrying currency."  Whatley-I depo at p. 146, l. 4-10.  Another
problem with reliance on Whatley's dog is that it had never been certified using an "open-air
sniff," as Whatley very reluctantly admitted.  Whatley-I depo at pp. 83, l. 15 - 86, l. 17.
Washington, who had not heard all of Whatley's testimony, claimed to have been present when
the dog *was* certified on open-air sniffs.  Washington depo at pp. 186, l. 1 - 187, l. 5.  Another
telling discrepancy made possible because Washington did not hear all of Whatley's testimony, is
that Washington claimed that Whatley did, and confirmed that he should, keep performance
records of when the dog has alerted without any drugs being found; Whatley had testified that he
kept no such records.  Washington depo at pp. 184, l. 8 - 185, l. 20; p. 244, l. 1-5; Whatley-I depo
at pp. 81, l. 18 - 82, l. 19.  Considerable evidence suggests the dog was an excuse, not a reason,
to conduct a search.

Washington had not even charged Morrow with a marijuana offense and that the explanation did

not rationally link the money to any criminal activity, Washington continued to dissemble, saying

it was because Morrow was supposedly going from Little Rock to the Galleria Mall "because

he's done smoked all he's got in his vehicle.  He's headed down to Houston to get him some

more smoke - ," all of which appears to be a figment of Washington's imagination.  *Id.*

Washington seems to think the Galleria Mall in Houston is a hotbed of narcotics trafficking,

fantastically claiming in his report that "Nine out of ten arrests in seized currency reveals

traffickers pick up narcotics and sell narcotics at the Galleria Mall."  *Id.* and *Plaintiffs' Exhibit*

*12*, Washington's Offense Report regarding Morrow, MOR00210-213.  Washington eventually

admits it was Whatley, not Morrow, who suggested Morrow was going to the Galleria Mall.  *Id.*

Washington repeatedly claims one of the totality of circumstances indicating criminal

activity is that Morrow can't identify the cousin he's going to visit in Houston, but, when

confronted with his own notes, admits Morrow had in fact named his cousin.  *Id.*; compare p.

171, l. 7-8, p. 174, l. 24-25, p. 178, l. 16-20, p. 182, l. 7-8 with pp. 190, l. 11 - 192, l. 9.

Washington also mentions Morrow had been arrested (not convicted) in 2001 or 2002, which is

no reason to suspect criminal activity in 2007, but still has no logical explanation for believing

Morrow's money or cell phones were related to criminal activity.  *Id.*  Ultimately, Washington

returned to a conclusory assertion of "totality of circumstances."  *Id.*; pp. 192, l. 25 - 193, l. 13.

When asked if the Morrow incident was typical of the interdiction program, Washington

responded, "That's the way we do it" and described it as a "very good example of pretty good

police work."  *Id.*, p. 193, l. 14-24.

When Morrow hired a lawyer and it was clear he was not going to just roll over, District

Attorney Defendant Russell readily agreed to drop the money laundering charges and return the money, because she felt there was *no* probable cause and "in the interest of justice." *Plaintiffs' Exhibit 13*, Russell letter of September 10, 2007 (MOR 00233), and *Plaintiffs' Exhibit 14*, *nolle prosequi* (MOR 00228).

c.      The Flores and Parsons Stop - Relevant to issues of typicality (Rule 23(a)(3) ) and adequacy (Rule 23(a)(2) )

Plaintiffs Javier Flores, who is Hispanic but appears to some to be African American, and William Parsons, who is of MacedoniaN descent but appears to some to be Hispanic, were traveling through Tenaha on July 22, 2008 when they were stopped by Defendant Constable Randy Whatley, who detained them, questioned them, searched their car, seized $8,400, arrested them, and threatened them only with money laundering charges before releasing them.  Whatley-I depo at pp. 204, l. 16 - 205, l. 4.  *See also* Third Amended Complaint (Doc. 111) at ¶¶ 97-100, and *Plaintiffs' Exhibit 15*, Whatley's Offense/Incident Report of 7/23/08 (SC 07783), and Whatley-I depo at pp. 200, l. 20 - 217, l. 5.[9]  Flores and Parsons are named Plaintiffs and proposed class representatives.  After taking their money, and letting Flores and Parsons go, when Whatley filled out his report he indicated he didn't really intend to follow through with any criminal prosecution by specifying "civil" instead of any criminal offense, on the arrest report. Whatley did not charge them with a traffic offense, and testified that only integrity and his own death would prevent him from falsely claiming that they were speeding to justify the stop. Whatley-I depo at pp. 205, l. 5 - 207, l. 3.  Whatley justifies searching their car because his dog supposedly alerted, which means sat down, to drugs, even through no drugs were ever found.

---

[9] *See* fn. 7

14

Whatley-I depo at pp. 81, l. 12 - 82, l. 19; pp. 208, l. 15 - 209, l. 9.[10]   Whatley found and seized $8,400 in their luggage in the trunk, charging them solely with a money laundering charge. Whatley-I depo at pp. 200, l. 17 - 201, l. 21.

Whatley claimed he took the money because he thought it was contraband.  *Id.*  When asked why he thought it was contraband he quickly recited in conclusory terms "probable cause," "the totality of factors," "training," "experience," "different indicators" and information allegedly received from a DEA agent in Pennsylvania and then he repeated "experience and training," "K-9 alert" and "totality of it." - none of which rationally substantiates any suspicion.  Whatley-I depo at p. 202, l. 1-15.

Whatley listed the specific circumstances he claimed contributed to the totality of circumstances indicating criminal activity.  Whatley said that Parsons was uneasy and both Flores and Parsons changed their demeanor, but he could not refer to any observable fact to substantiate those conclusions.  Whatley-I depo at pp. 207, l. 4 - 208, l. 6; pp. 209, l. 16 - 211, l. 4.[11]  Whatley also cited bandanas on luggage, large clothing, and the fact that their money was bound with a rubber band, to all be circumstances indicating some unspecified narcotics activity based not on any rational explanation but only on his alleged training and roadside experience. Whatley-I depo at pp. 207, l. 4 - 214, l. 14.

Whatley also claimed that the DEA in Pennsylvania identified Flores or Parsons as a

---

[10] *See* fn 8, regarding the reliability of Whatley's dog.  Whatley's video recording reflects that once he searched the contents of the trunk and took the $8,400, he made no effort to search the rear bumper, lights, fenders or wheel wells for any drugs he should have believed the dog alerted on.

[11] Nor are these conclusions supported by anything in the video recording.

15

"meth and ice dealer," but did not substantiate or detail that allegation in any way, and still could not identify the suspected narcotics activity or even the type of drug he thought was involved. Whatley-I depo at pp. 214, l. 7 - 217, l. 5.  Whatley concluded the $8,400 he seized was connected to some unspecified narcotics activity in Pennsylvania, based on his experience and training, even though he never asked the authorities in Pennsylvania if they had any reason to think there was any connection.  *Id.*

Whatley's deposition was continued from April 12, to June 7, 2010.  Even when reconvened in June, with the help/interference of defense counsel, Whatley was unable to specify any particular criminal activity the $8,400 was connected to.  Whatley-II depo at pp. 42, l. 17 - 60, l. 17.  Whatley's last explanation was only that the DEA allegedly tagged Parsons as a meth and ice courier and that he had once allegedly been arrested (though not convicted) in Ohio.  *Id.* at p. 59, l. 9-21.  However, a review of the video record will reveal that Whatley was not aware of these unsubstantiated rumors at the time he arrested Flores and Parsons, and they do not rationally connect the seized money to any criminal activity.

After taking their money Whatley released Flores and Parsons, suggesting that Whatley did not really think there was any criminal activity.  Ultimately, Flores and Parsons were no-billed by a grand jury and Defendant District Attorney Russell returned the money (most of which understandably went to their lawyer).  *Plaintiffs' Exhibit 16*, Russell letter of 11/13/08, SC08491.

d.  <u>Racial Profiling - relevant to common questions of fact (Rule 23(1)(2) ) and a defendant's action that applies generally to the class (Rule 23(b)(2) ).</u>

Texas requires all law enforcement agencies to have a prescribed policy prohibiting racial

profiling, to collect racial profiling information and report it to the governing bodies served by the agency.  Texas Code of Crim. Pro. § 2.132 (b)(6) and (7)  (2001).

Defendant Whatley conceded that the Precinct 4 Constable's office of Shelby County is a law enforcement agency, but he did not have the required racial profiling policy or report the required racial profiling information to the County.  Whatley-I depo at pp. 133, l. 1 - 136, l. 13. Whatley testified he was aware of no way to determine if he was disproportionately stopping members of ethnic groups.  Id.[12]

The only properly disclosed racial profiling information even partially complying with the statute[13] in this case reflects a dramatic increase in the proportion of Tenaha's  traffic stops of non-Caucasians that coincides with the beginning of the interdiction program at issue.  *See Plaintiffs' Collective Exhibit 17*, including Tier 1 racial profiling data for Tenaha from 2003 through 2009.  For 2003 to 2006, before the interdiction program, an average of about 32% (ranging from 30 to 33% in those years)  of Tenaha's traffic stops were of non-Caucasians.  *Id.* In 2007, the first full year of the interdiction program, the proportion of non-Caucasians increased dramatically to about 52%.  When this difference is statistically analyzed, the

_____

[12] Defendants were ordered to disclose racial profiling documents in August 2009. Memorandum Opinion and Order (Doc. 86).  About 10 months later, after Whatley's initial deposition, he did produce some "contact sheets."  When his deposition was reconvened his testimony suggested that the contact sheets are partially obscured, may be incomplete, unreliable and created for defense purposes.  Whatley-II depo at pp. 4, l. 19 - 24, l. 24.

[13]  The reports for Tenaha include only information on stops, not required information on searches.  The reports are known as "Tier 1 Data," and have been disclosed for 2003 - 2009; all are included in *Plaintiffs' Exhibit 17*.  In 2007 Tenaha changed the format of the report, and apparently shifted the 12 months covered, and for that year produced both formats.  The format consistent with the earlier years will be referred to as 2007a and is discussed in the text above. The newer format is referred to as 2007b in *Plaintiffs' Exhibit 17*, where both versions are included in the analysis.

17

probability of the increase occurring as a matter of random chance approach zero, at a highly significant level of more than 10 standard deviations.[14]  The increase remains grossly dramatic and similarly significant for 2008.

In 2009, after the issues in this case were fully joined, the proportion shifts dramatically, decreasing to only about 23% of Tenaha's stops involving non-Caucasians, a shift that remains significant and highly unlikely to occur by random chance.

In discrimination cases disparities that are measured at only 2 or 3 standard deviations support an inference of discrimination if the disparities are not reasonably explained.  Castaneda v. Partida, 430 U.S. 482, 496 fn. 17 (1977).  Here the disparities are much stronger and more significant than this threshold.  Left unexplained, the disparities in this case support an inference that non-Caucasians were targeted for stops in 2007 and 2008 and that the reported information, if not the practices, for 2009 may have been distorted for defensive reasons due to this litigation.

e.    Numerosity (Rule 23(a)(1) )

Defendants Constable Whatley and Deputy Marshal Washington did most of the traffic stops in the interdiction program.  Whatley-I depo at p. 159, l. 14-21.  Whatley estimates the number of stops to be more than 100, as many or 500 or 1,000, with no real upper limit.  Whatley-I depo at p. 158, l. 1-8; p. 160, l. 3-7.  Washington estimated the number of stops he made to be more than 100, but he couldn't say if more or less than 500.  Washington depo at pp. 124, l. 21 - 126, l. 11.  The City of Tenaha designated City Marshal Fred Walker to testify about

---

[14] *Plaintiffs' Exhibit 17* includes a basic statistical analysis, readily replicated, performed by counsel using a calculator (TI-84 Plus) commonly used in high school algebra classes and borrowed from his daughter.  The test used shows the statistical significance or number of standard deviations, and probability of the increase in proportions of non-Caucasians stopped in Tenaha after the Defendants began the interdiction program.

the interdiction program and the number of apparent minorities stopped but he was unable to provide that information and the City has not supplemented. Walker depo at p. 8, l. 2-13 (designation as witness); pp. 81, l. 15 - 82, l. 11. The racial profiling reports disclosed for Tenaha only for 2007b, 2008 and 2009 reflect 829 non-Caucasians were stopped. *See Plaintiffs' Exhibit 17.*

f.     Defendants' monetary motive - relevant to the existence of a common issue of fact (Rule 23 (a)(2) and (b)(2) )

State law restricts use of seized and forfeited monies. Tex. Code Crim. Pro. § 59.06(c)(1), (2) and (3) (solely for official purposes of a District Attorney's office or, for other law enforcement agencies, solely for law enforcement purposes). Considerable evidence suggests the Defendants failed to restrict the use of revenue from the interdiction program. The City of Tenaha designated both Walker and Bowers to testify about compliance with § 59 and documents reflecting compliance. Although he initially denied it, Walker conceded that revenue from the interdiction program significantly affected the City of Tenaha by making it possible to buy a building, cars, and all kinds of office equipment. Walker depo at pp. 46, l. 8 - 47, l. 23. Washington testified that he was given $40,000 in forfeiture funds by the Shelby County District Attorney (Defendant Russell) and Defendant Whatley. Washington depo at p. 207, l. 8-15; pp. 210, l. 23 - 211, l. 20.

Defendant Mayor Bowers testified that the City's proceeds from the interdiction program were to be used only for law enforcement purposes, but could identify no records reflecting such a restriction. Bowers depo at pp. 137, l. 16 - 138, l. 10. Bowers testified that the City used a significant portion of their proceeds to buy a building, only a fourth of which is used for law

enforcement.  Bowers depo at pp. 142, l. 25 - 143, l. 23.  The City Marshal's office decided how to spend the money.  *Id.*, pp. 147, l. 20 - 148, l. 5.

Defendant Whatley had made his living doing auctions and "wheeling and dealing" - buying, selling and swapping stuff.  Whatley-I depo at pp. 19, l. 12 - 21, l. 23.  Whatley estimated that his operating budget as a constable was $5,000, or less, per year, before the interdiction program.  Whatley-I depo at pp. 177, l. 14 - 179, l. 2.  After the interdiction program started he bought a building, instead of using his own car and paying expenses out of his own pocket he bought four pick-up trucks, a Charger, a Magnum and an Expedition, and was free to use them for personal use.  Whatley-I depo at pp. 186, l. 1 - 187, l. 24.  He personally bought a radar trailer and two of the vehicles and sold them to the constable's office.  Whatley-I depo at p. 192, l. 2-9.  He bought a golf cart and dressed it up with lights, a siren and a radio.  Whatley-I depo at p. 198, l. 7-25.  Whatley testified that his office may have benefitted in the "realm" of $1000 in the year before the interdiction program, but $300,000 or more under the interdiction program.  Whatley-I depo at pp. 179, l. 22 - 188, l. 13.  Whatley decided how to spend the money without constraint imposed by any other person.  Whatley-I depo at p. 183, l. 2-10; Strong depo at pp. 129, l. 24 - 130, l. 11.

The Shelby County Auditor, who held Whatley's forfeiture account, didn't know if he was buying things for personal use or not.  Strong depo at p. 132, l. 3-6.  She also testified that nothing prevented Whatley from self-dealing to personally profit from spending the proceeds of the interdiction program.  *Id.* at p. 20, l. 9-18.

The Auditor categorized Defendant Russell's expenditures from her forfeiture fund and noted over $22,000 in questionable expenditures for campaign materials, festivals, parades,

personalized frisbees, glitter pencils, holiday decorations and costumes (*see Plaintiffs' Exhibit 18*, p. -1-), over $3,600 in questionable expenses for food (*Id.*, p. -2-), over $40,000 in questionable donations to a children's advocacy center (*Id.*, p. -3-), over $47,000 in questionable expenditures for equipment for other agencies (*Id.*, p. -5-), over $320 in questionable expenditures for late fees for Russell's credit cards (*Id.*, p. -6-), and over $2,000 in questionable expenditures for flowers, gifts, memberships, dues and events (*Id.*, p. -7-).  The Auditor also testified that Defendant Russell spent over $50,000 in so-called "salary" expenses, including $30,000 to Defendant Washington, in irregular payments that the Auditor does not think comport with Chapter 59.  Strong depo at pp. 71, l. 22 - 73, l. 4.

### III

### Rule 23(a) Class Action Prerequisites

(a)   Rule 23(a)(1): The class is so numerous that joinder of all members is impracticable ("Numerosity")

While there is no hard and fast threshold as to when a class is sufficiently numerous that joinder would be impracticable, a suggested and widely accepted rule of thumb is that a class of 40 or more generally satisfies the numerosity requirement.  Mullen, *supra*, 186 F.3d at 624; Casale v. Kelly, 257 F.R.D. 396, 408 (S.D. N.Y. 2009); *McLaughlin on Class Actions* § 4:5 (Thompson West)(suggesting courts grant more latitude in cases seeking injunctive relief), and *Newberg* § 3:3 (noting that courts have certified plaintiff classes with as few as 14 members); *see also* Grant v. Sullivan, 131 F.R.D. 436, 446 (M.D. Pa. 1990).  The evidence described in Section IV(e) more than meets the numerosity requirement.

The City of Tenaha's Tier 1 racial profiling reports reflect that for 2007 through 2009,

there have been 825 non-Caucasians stopped under the interdiction program.  Defendant Whatley has testified that the interdiction program at issue involved in upwards of 500 or 1,000 people with no upper limit.  Defendant Washington testified he stopped more than 100, but does not know if it was more than 500.  The City of Tenaha designated City Marshal Fred Walker to testify about the interdiction program and the number of apparent minorities stopped but he was unable to provide that information and the City has not supplemented.[15]  While mere speculation about the number of class members is insufficient, the exact number or identity of class members is not required and good faith estimates are generally deemed sufficient.  *Newberg* at § 3.5.  The Advisory Committee Notes to Section (b)(2) approves of classes "whose members are incapable of specific enumeration."  The numbers reflected in the Tier 1 reports and the estimates testified to by Defendants Whatley and Washington satisfy the numerosity prerequisite.

Though referred to as the "numerosity" requirement, it is the impracticability of joinder that matters.  Rule 23(a)(1).  Geographic considerations, here that the class members are travelers on a state highway, also indicate that joinder is impracticable in this case.  <u>Mullen</u>, *supra*, 186 F.3d at 624.  Six of the named Plaintiffs are from out-of-state.  *See* Plaintiffs' Third Amended Complaint (Doc. 111).

(b)     <u>Rule 23(a)(2): There are Questions of Law or Fact Common to the Class ("Commonality")</u>

"The test of commonality is not demanding and is met where there is at least one issue, the resolution of which will affect all or a significant number of the putative class members."

---

[15] When a designated witness is unable to provide requested testimony, the designating entity is obliged to provide a substitute.  <u>Brazos River Authority v. G. E. Ionics</u>, 469 F.3d 416, 433 (5th Cir. 2006).

Mullen, *supra*, 186 F. 3d at 625, quoting Lightbourn v. County of El Paso, Tex., 118 F.3d 421, 426 (5th Cir. 1997). "All that is required for each class is that there is one common question of law or fact ..."; James v. City of Dallas, 254 F.3d 551, 570 (5th Cir. 2001). Where the injuries complained of allegedly result from the same unconstitutional practice or policy that also allegedly injured, or will injure, class members, the commonality requirement is met. Daniels v. City of New York, 198 F.R.D. 409, 418 (S.D. N.Y. 2001). Commonality was found to exist in Forbush v. J.C. Penney Co., Inc., 994 F.2d 1101, 1105-06 (5th Cir. 1993), even though the similar injuries could be caused by four different means. *Id.*

Here Plaintiffs assert that their rights and the rights of members of the putative class were violated by the Defendants' interdiction program, satisfying the commonality requirement.

(c)     Rule 23(a)(3): The Claims of the Representative Parties are Typical of the Claims of the Class ("Typicality")

> Like commonality, the test for typicality is not demanding. It focuses on the similarity between the named Plaintiffs' legal and remedial theories and the theories of those whom they purport to represent. Typicality does not require a complete identity of claims. Rather, the critical inquire is whether the class representative's claims have the same essential characteristics of those of the putative class. If the claims arise from a similar course of conduct and share the same legal theory, factual differences will not defeat typicality.

James v. City of Dallas, *supra*, 254 F.3d at 571 (citations omitted). Claims of class representatives and the proposed class arising from the same allegedly unlawful activity satisfies the typicality requirement. Daniels, *supra*, 198 F.R.D. at 418.

There is substantial, if not compelling, evidence that the proposed class representatives were subjected to the same interdiction program as the rest of the proposed class, as described in Section IV (a), (b), (c), (d) and (f), and as a result their claims are typical of those of the proposed

class.  Washington's testimony that "that's the way we do it" when asked if his treatment of Morrow was typical, and Whatley's testimony that all of the citizens affected by the interdiction program were treated the same and subject to the same rules removes any credible doubt about typicality.

Here, the proposed class representatives seek to assert claims on their own behalf and on behalf of the proposed class challenging as unconstitutional the Defendants' interdiction program, which satisfies the typicality requirement of Rule 23(a)(3).

(d)      Rule 23(a)(4): The Representative Parties Will Fairly and Adequately Protect the Interests of the Class[16]

Where, as here, the proposed representatives' interests are identical to those of the proposed class, and there are no conflicts, the adequacy requirement is met.  Mullen, *supra*, 186 F.3d at 625-26; *see also* Daniels, *supra*, 198 F.R.D. at 418-19.  While Defendants may try to amplify differences between the proposed representatives and the class, differences do not defeat adequacy unless they rise to the level of conflicts of interest.  Mullen, *supra*, 186 F3d at 625-26.

Proposed class representatives Morrow, Parsons and Flores have all provided declarations reflecting their support of class certification, their willingness to serve as class representatives, and pledging to place the interests of the class above their own, and to cooperate in the prosecution of this case.  *See* Declarations of Morrow, Parsons and Flores, attached as *Plaintiffs' Collective Exhibit 19*.  All of these proposed class representatives have testified at deposition in this case.

_____

[16] In 2003 Rule 23(g) was added, requiring the Court to consider and appoint adequate class counsel.  Previously, the adequacy of class counsel had been a component of adequacy under Rule 23(a)(4).

It should also be noted that any unforeseen doubts about adequacy would likely not defeat certification; when problems with adequacy do arise, formation of subclasses should be considered and Plaintiffs should be given an opportunity to identify and nominate substitute representatives. *Newberg*, § 7:24.

## IV

## Rule 23 (b)(2)

A Rule 23(b)(2) class is appropriate if the defendants act on grounds generally applicable to the class, so that final injunctive or corresponding declaratory relief is appropriate respecting the class as a whole. Although (b)(2) certification is not limited to civil rights cases, the Advisory Committee Notes specifically refer to "actions in the civil rights field where a party is charged with discriminating unlawfully against a class, usually one whose members are incapable of specific enumeration" as being illustrative of the type of class property certified under (b)(2). This is just such a case.

The Defendants' interdiction program described in Sec. IV (a), (d)-(f) constitutes the action generally applicable to the class itself. The substantial evidence that Defendants disproportionately visit their interdiction program on members of ethnic minorities, people who appear to be ethnic minorities, and those in their company, makes this case one of those illustrative of what a (b)(2) class should look like. Similar claims have been certified under (b)(2) in Allen v. Leis, 204 F.R.D. 401, 408-10 (S.D. Ok. 2001), and Daniels, *supra*, 196 F.R.D. at 422.

The injunctive and declaratory relief primarily sought also comports with the (b)(2) category of class actions. Note that seeking injunctive and/or equitable relief in a (b)(2) class

does not preclude equitable, or other, monetary relief so long as subjective, individualized determinations are not required.  In re: Monumental Life, *supra*, 365 F.3d 418-20.

Under the current law of this circuit, a class certified under (b)(2) probably cannot assert claims for compensatory and punitive damages that require individualized subjective determinations.  Allison v. Citgo, *supra*, 151 F.3d at 416-17.  However, as mentioned, in Duke v. Wal-Mart, 603 F.3d 571 (9th Cir. 2010), this issue may be reviewed by the Supreme court in the near future.

## V

### Rule 23 (b)(3)

Plaintiffs do not intend to foreclose consideration of certification, or partial / hybrid certification under subsection (b)(3).

## VI

### Class Counsel

In 2003 Rule 23 was amended by the addition of subsection (g) which requires the Court to appoint class counsel.  Plaintiffs are represented by three lawyers, with separate law practices.

Stephanie Stephens obtained her J.D. from the University of Houston in 1990.  Ms. Stephens brings considerable prosecution and law enforcement experience to the Plaintiffs.  She worked in the Harris County District Attorney's office from before finishing law school through 1996, in the Walker County Criminal District Attorney's office from 1998 until 2000, and in the Nacogdoches County District Attorney's office from 20002 until 20008, the last for years as the elected District Attorney.  She has been in a solo practice since 2009, focusing on criminal defense.  She provides the Plaintiffs with invaluable law enforcement perspective and

experience, that other Plaintiffs' counsel lack.

David Guillory obtained his J.D. from the University of Texas in 1989.  He worked in the Texas Attorney General's Office Employment and Civil Rights Division from 1989 to 1993, representing plaintiffs and defendants.  In 1993-94 he worked in Houston in the Law Office of David T. Lopez, focusing on federal employment discrimination cases.  From 1994 until 2009 Mr. Guillory had a solo practice in Nacogdoches, in which he handled a variety of primarily plaintiff-side litigation in state and federal courts, mostly employment civil rights cases.  In 2009 Mr. Guillory began winding down his private practice and accepted a position as Lone Star Legal Aid where he works out of their Nacogdoches office as Litigation Director.  This is a case he still carries from his private practice.  Mr. Guillory was the lawyer who initiated this case, has had most of the client contact and who has taken the lead in identifying and investigating Plaintiffs and potential claims.

Timothy Garrigan finished Northeastern University School of Law in 1983, clerked for United States Magistrate Judges Hon. Houston Abel and Hon. Harry W. McKee, here in the Eastern District of Texas, and has practiced in Nacogdoches with his current three-lawyer firm Stuckey Garrigan & Castetter since 1985.  He has been involved in this case since before it was filed, initially consulting with and providing advice to Mr. Guillory and taking on additional responsibilities as Mr. Guillory wound down most of his private practice.  Mr. Garrigan has probably done most of the legal work for the Plaintiffs.  Mr. Garrigan has primarily practiced civil rights law in the Eastern District of Texas, and with his firm has served as counsel in a variety of class, collective, and complex cases in this jurisdiction.  In one instance when a case required significant additional resources, Garrigan was able to associate with a nationally

prominent firm that was able to provide the additional necessary resources.

Counsel request that they jointly be appointed class counsel. If the Court prefers to designate one of the lawyers as a primary, counsel suggest that Mr. Garrigan be appointed to that position because of his prior class action experience. Of course, all counsel will provide any additional information the Court requests pertinent to Rule 23(b)(1)(B) or (C).

<u>CERTIFICATE OF CONFERENCE</u>

On 08/05/2010 I spoke with Tom Henson by phone. He could not agree to the motion or that any subparts of Rule 23 were applicable, but said he would study the subparts (particularly numerosity) and would let me know if he thought agreement was possible. Later the same day I had a similar phone call with Robert Davis, Chad Rook and Bob Alderman, that reached a similar result except that they each said they would confer with their clients to make a final decision and would let me know, and Mr. Davis said he would also explore agreement on the adequacy of Plaintiffs' counsel as well as numerosity. Defense counsel have not advised that any agreement is possible so this motion must be considered contested.

Respectfully submitted,

/S/ TIMOTHY B. GARRIGAN

By: _____

Timothy B. Garrigan
Bar Card No. 07703600
tim@sgclaw.org
Stuckey, Garrigan & Castetter
2803 North Street, P.O. Box 631902
Nacogdoches TX 75963-1902
(936) 560-6020     FAX: (936) 560-9578

and

By:

/S/ DAVID J.GUILLORY

_____

David J. Guillory
Bar Card No. 08596400
david.guillory@lonestarlegal.org
510 Ochiltree Street
Nacogdoches TX 75961
(936) 559-9600     FAX: (936)715-9339

and

By:

/S/ STEPHANIE STEPHENS

_____

Stephanie Stephens
Bar Card No.
stephens_law@att.net
119 North St., Suite E
Nacogdoches TX  75961
(936) 559-7600   FAX: (936) 559-7601

ATTORNEYS FOR PLAINTIFFS

29

CERTIFICATE OF SERVICE

I hereby certify that I have served all parties of record in this case including the following with a true and correct copy of the foregoing Plaintiffs' Motion for Class Certification by sending same via electronic filing/FAX/hand delivery/U. S. mail, postage prepaid:

Tom Henson
Ramey & Flock
100 East Ferguson, Suite 500
Tyler TX 75702

Robert S. Davis / Chad C. Rook
Flowers Davis
1021 ESE Loop 323, Ste 200
Tyler TX 75701

Robert Alderman, Jr.
Zeleskey Cornelius et al.
P O Drawer 1728
Lufkin TX 75902-1728

on this 16th day of August, 2010.

/S/ TIMOTHY B. GARRIGAN

_____
Timothy B. Garrigan

30