**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
MARSHALL DIVISION**

| | | |
|---|---|---|
| JAMES MORROW, and a Proposed Class of | § | |
| Other Similarly Situated Persons | § | |
| Plaintiffs, | § | |
| | § | CIVIL ACTION NO. 2-08-cv-288-TJW |
| v. | § | |
| | § | |
| CITY OF TENAHA DEPUTY CITY | § | |
| MARSHAL BARRY WASHINGTON, et al | § | |
| Defendants. | § | |

## MEMORANDUM OPINION AND ORDER

Pending before the Court is Plaintiffs' Motion for Class Certification (Dkt. No. 179), Plaintiffs' Supplemental Motion for Class Certification (Dkt. No. 194), and Plaintiffs Second Supplemental Motion for Class Certification (Dkt. No. 213). In the motions, the named plaintiffs ("Plaintiffs") seek certification of a class of motorists and passengers who are subject to the City of Tenaha's allegedly discriminatory interdiction program under Federal Rule of Civil Procedure 23(b)(2) for declaratory, injunctive, and monetary relief. The Court held a hearing on the motions on November 9, 2010, but, at the parties' request, stayed its ruling on the motions for class certification to give the parties an opportunity to mediate this case (Dkt. No. 212). Then, on December 6, 2010, the Supreme Court accepted certiorari in *Wal-Mart Stores, Inc. v. Dukes*, to determine, in part, "[w]hether claims for monetary relief can be certified under Federal Rule of Civil Procedure 23(b)(2) – which by its terms is limited to injunctive or corresponding declaratory relief – and, if so, under what circumstances." 131 S.Ct. 795 (2010). Because the Supreme Court's ruling weighed so heavily on the issue of class certification in this case, the court stayed its ruling on the motion for class certification pending the Supreme Court's ruling in *Wal-Mart*. The Supreme Court issued its ruling in *Wal-Mart* on June 20, 2011. *See Wal-Mart*

1

*Stores, Inc. v. Dukes*, 131 S.Ct. 2541 (2011).    After considering the parties' filings, evidence, oral arguments, and the applicable law, the Court ORDERS that the motion for class certification should be GRANTED-IN-PART and a Rule 23(b)(2) class certified for injunctive and declaratory relief as discussed below.    However, the Court does not certify any claims for monetary relief as part of the Rule 23(b)(2) class.

## I.    Background

Plaintiffs bring this action against various city officials in Tenaha, located in Shelby County, Texas, including Deputy City Marshal Barry Washington ("Washington"), Mayor George Bowers ("Bowers"), Shelby County District Attorney Linda K. Russell ("Russell"), Shelby County District Attorney Investigator Danny Green ("Green"), and Shelby County Precinct 4 Constable Randy Whatley ("Whatley").    Plaintiffs allege that the Defendants developed an illegal "stop and seize" practice of targeting, stopping, detaining, searching, and often seizing property from individuals who are, or appear to be, members of a racial or ethnic minority and their passengers.    Plaintiffs refer to this allegedly discriminatory stop and seize practice as Tenaha's "interdiction program" and allege that it began when Tenaha hired Washington as a Deputy City Marshal on November 1, 2006, and is still ongoing.    According to Plaintiffs, defendants Washington and Whatley targeted members of the proposed class for traffic stops because of their race or ethnicity and then, with the approval and complicity of the other defendants, subjected them to detention, arrest, or search and seizure without legal justification and in violation of their constitutional rights.    Plaintiffs further allege that the Defendants instituted the interdiction program in order to enrich their offices and themselves by seizing and converting cash and other valuable personal property they could find during the course of the illegal stop and seize practice.    Plaintiffs claim that the Defendants' conduct violates their Fourth Amendment right to be free from unreasonable searches and seizures and

their Fourteenth Amendment rights to equal protection and due process. Plaintiffs seek class-wide declaratory, injunctive, and equitable monetary relief, as well as compensatory and punitive damages.

## A. Tenaha's "Interdiction Program"

The City of Tenaha hired Washington in the fall of 2006 to be a Deputy City Marshal. Deposition of Barry Washington ("Washington Depo") at 56:11-14, Exhibit 1 to Plaintiffs' Motion for Class Certification ("Opening Brief") (Dkt. No. 179). The evidence demonstrates that shortly after Washington started on November 1, 2006, the City of Tenaha began its "interdiction program." *See* Washington Depo at 51:15-16, 64:16-17, 68:12-69:4, 70:8:19, 97:23-99:18; Deposition of George Bowers ("Bowers' Depo") at 41:3-7, Exhibit 5 to Opening Brief; First Deposition of Randy Whatley on April 12, 2010 ("Whatley Depo I") at 89:17-90:21, Exhibit 2 to Opening Brief.

Defendant Whatley, the Shelby County Precinct 4 Constable, testified that he understood that the goal of the interdiction program was to stop as many people as possible for traffic violations to look for other criminal activity, primarily narcotics trafficking. Whatley Depo I at 124:23-125:13. Whatley testified that over the course of the interdiction program that as many as 500 or even 1,000 people were stopped as part of the interdiction program. Whatley Depo I at 158:1-8. Both Washington and Whatley testified that the interdiction program evolved, but was never written down and that there was never anyone in charge of it. Washington Depo at 68:12-69:4; Whatley Depo I at 126:16-127:8. However, Constable Whatley also testified that all of the citizens caught up in the interdiction program were subject to the same rules and treated the same. Whatley Depo I at 85:8-21. In addition, Tenaha City Marshal Fred Walker ("Walker"), who was designated by the City of Tenaha to testify about the interdiction program on its behalf,

testified that all citizens are treated according to the same rules under the interdiction program and that there have been no changes made to the interdiction program. Walker Depo at 5:23-6:8, 45:20-24, 85:8-12. Walker also testified that there are no limits to the searches that can be performed under the interdiction program, that whether to arrest someone under the interdiction program is up to the discretion of the officer who made the stop, and that there are no limits on what the officer can seize under the interdiction program. Deposition of Fred Walker ("Walker Depo") at 30:4-33:20, Exhibit 4 to Opening Brief.

Deputy Marshal Washington testified that God "ordained" him to patrol Highway 59, and that God gave him the gift of being able to put crooks in jail. Washington Depo at 55:18-19 and 65:2-5. Washington described the "interdiction traffic stop philosophy" in his deposition, saying that "when we're making traffic stops, you have to look beyond the initial traffic stop and the traffic violation if somebody is giving you indicators that there's criminal activity taking place." Washington Depo at 73:13-17. When asked what those indicators of criminal activity might be, Washington responded:

> Well, there could be several things. There could even be indicators on the vehicle. The number one thing is you have two guys stopped, and these two guys are from New York.
> They're two Puerto Ricans. They're driving a car that has a Baptist Church symbol on the back, says First Baptist Church of New York.
> They're traveling during the week, when most people are working and children are in school. They've borrowed this car from their aunt, and their aunt is back in New York.
> You interview the two men, and they don't have a job, and they're on vacation. They don't have any substantial amount of luggage for the two people to travel from New York to Houston.
> They're nervous. They have conflicting stories. Sometimes they don't even know each other. They may have emblems on the car that have Gregg County Sheriff's Office on it. Just indicators.

Washington Depo at 73:19-74:18.

During interdiction stops, once Washington or Whatley made the decision to seize money or property and/or arrest an individual, they would call the Shelby County District Attorney's Office or Defendant Russell, the Shelby County District Attorney, to reach a consensus as to how to proceed—i.e., whether to release the individuals, arrest them, seize their property, or return property that had already been seized. Whatley Depo I at 163:21-168:19. District Attorney Russell had an agreement with the Tenaha Marshal's office and the Constable's office on what percentage of the seizures the District Attorney would get. Whatley Depo I at 148:3-21.

Plaintiffs allege that the interdiction program targets drivers or passengers who are or appear to be members of a racial or ethnic minority. To support this assertion, Plaintiffs offer statistical evidence that the proportion of racial and ethnic minorities stopped in Tenaha increased dramatically in 2007, shortly after the interdiction program began in November 2006. Plaintiffs allege that the only disclosed racial profiling information in this case—the "Tier 1 data"—reflects a dramatic increase in the proportion of Tenaha's traffic stops of non-Caucasians in 2007. *See* Tiered 1 profiling data for Tenaha from 2003 through 2009 ("Tier 1 Data"), Exhibit 17 to Opening Brief. Based on Plaintiffs' calculations, from 2003 through 2006, before the interdiction program was put into effect, an average of about 32% of Tenaha's traffic stops were of non-Caucasians. In 2007, the first full year of the interdiction program, the proportion of non-Caucasians increased dramatically to between 46.8% and 51.9%, depending on the records used.[1] Plaintiffs argue that when this difference is statistically analyzed, the probability of the increase occurring as a matter of random chance approachs zero. Plaintiffs also argue that the increase

---

[1] In 2007 Tenaha changed the format of the report for the Tier 1 data on stops, and appears to have shifted the 12 months covered in each year. Accordingly, Plaintiff calculated the percentage of non-Caucasians stopped in 2007 using 2007 data reported in the original and revised format. Exhibit 17 to the Opening Brief lists the 2007 information in the original format as 2007a and the 2007 information in the revised format as 2007b. 2007a reflects that 51.9% of the stops were of non-Caucasians while 2007b reports that 46.8% of the stops were of non-Caucasians. *See* Tier 1 Data.

remains similarly significant for 2008, where the number of non-Caucasians stopped was 45.7%. Plaintiffs further argue that in 2009, after this lawsuit was filed, the proportion shifted dramatically, decreasing to only about 23% of Tenaha's stops involving non-Caucasians. Plaintiffs contend that this drop occurred after the lawsuit. Plaintiffs, therefore, argue that the high proportion of minorities subject to traffic stops under the interdiction program supports an inference that non-Caucasians were selectively targeted for stops as part of the interdiction program.

Plaintiffs also suggest that the real motivation behind Tenaha's interdiction program was to confiscate money and property from those stopped in order to enrich the city of Tenaha and the Defendants personally. In other words, Plaintiffs allege that the Defendants had no legitimate reason to suspect that those stopped by the interdiction program were engaged in criminal activity, but, nevertheless, detained them, arrested them, and often searched their vehicles without justification in the hopes that they would find valuables or money that could be confiscated and used to enrich the City of Tenaha and themselves. Additionally, Plaintiffs allege that Defendants had no reason to suspect that the money and property often confiscated under the interdiction program was related to suspected criminal activity. In support of this allegation, Plaintiffs provided evidence that the City of Tenaha could not articulate any reason to suspect that Plaintiffs Morrow, Flores, or Parsons, the proposed class representatives, or named Plaintiffs Watson, Busby, Dismukes, Dorman, or Pearson were engaged in criminal activity. Walker Depo at 8:1-11:2 and 94:1-96:4. As discussed in more detail below, the evidence shows that each of the proposed class representatives and named plaintiffs were arrested and/or detained, had their vehicles searched, and had their property confiscated.

The offense report for Boatright and Henderson indicates that they were initially stopped for "driving in the left lane for over a half mile without passing and crossing over white line." Offense/Incident Report for Ronald Henderson and Jennifer Lynn Boatwright ("Boatright/Henderson Offense Report") at MOR00121, Exhibit F to Defendants' Response to Motion for Class Certification ("Response") (Dkt. No. 201). Boatright is white, but Henderson is African-American. Third Amended Complaint at ¶ 83. Walker stated that when he stopped named Plaintiffs Boatright and Henderson, they had been smoking marijuana and that there was drug paraphernalia in the car, including a glass marijuana pipe in the center console. Walker Depo at 96:15-97:7, 99:25-100:19. Walker also claimed that Boatright and Henderson admitted to buying illegal narcotics in Houston. *Id.* However, Walker could not explain how the $6,000 seized from Plaintiffs Boatright and Henderson was related to any criminal activity. Walker Depo at 99:25-100:19. The Boatright/Henderson Offense Report indicates that Washington and Whatley believed the cash to be the proceeds from narcotics trafficking because Boatright and Henderson: (1) were traveling from Houston, Texas to Linden, Texas; (2) were in a rental car; (3) had been smoking marijuana; (4) watched traffic passing while they were stopped; (5) and admitted to buying marijuana at a bar. Boatright/Henderson Offense Report at MOR00123-MRO00124. According to the Offense Report, these were "common factors" of illegal narcotics trafficking. *Id.* at MOR00124.

Similarly, the offense report for named plaintiffs Busby and Watson states that they were passengers in a car driven by Dale Christopher Agostini, who is African-American. Offense/Incident Report for Dale Christopher Agostini, Amanee Yasameen Busby, and Stephen Stuart Watson ("Busby/Watson Offense Report") at MOR00300-302, Exhibit G to Response. Busby and Watson are also African-American. Third Amended Complaint at ¶ 39. They were

stopped for "traveling in left lane marked for passing only and would not move to right lane to let vehicle move from middle medium." *Id.* at MOR00300. The report indicates that the vehicle was searched after Constable Whatley's drug dog, K-9 Bo, "gave a positive alert on the rear left door area of the vehicle." *Id.* However, there is no evidence in the record to indicate that the roughly $50,000 in cash seized from the car was related in any way to criminal activity. *Id.* During his deposition as the representative of the City of Tenaha, Walker could not articulate any reason to suspect that Watson or Busby were engaged in criminal activity. Walker Depo at 8:1-11:2 and 94:1-96:4

The offense report for named plaintiff Yuselff L. Dsimukes ("Dismukes") indicates that he was one of two cars traveling together that were pulled over by Defendant Washington for speeding violations. Offense Report of Eric Johnson, Dareyl Danield, Yuselff L. Dismukes ("Dismukes Offense Report") at MOR00001-MOR00004, Exhibit H to Response. However, the report is somewhat unclear as to the specific speeding violation prompting the stop. The report states: "the vehicle was stopped for speeding over 35 mph, clocked on radar at 41 mph and 49 mph in a 45 mph speed zone and at 60 mph in a 55 mph posted zone." *Id.* at MOR00003. Dismukes is African-American. Third Amended Complaint at ¶ 57. The report indicates that Defendant Washington "smelled the odor of burned marijuana" in both cars and that the K-9 Bo alerted to the vehicle in which Mr. Dismukes was a passenger. *Id.* After speaking with Defendant Russell, all three men, including named plaintiff Dismukes, were arrested based on the fact that there were "large sums of US currency; odor of burned marijuana, [and] marijuana residue" in one of the cars. *Id.* at MOR00004.

According to the police report, named plaintiffs Dorman and Pearson were pulled over for "no LP light and FTC." Offence/Incident Report of Linda M. Dorman and Marvin C.

Pearson ("Dorman/Pearson Offense Report") at MOR00108, Exhibit B to Response. Dorman and Pearson are African-American. Third Amended Complaint at ¶ 72. The offense report also indicates that Washington "could smell a faint odor of what [he] believed to be marijuana" in the car and that K-9 Bo alerted on the car. Dorman/Pearson Offense Report at MOR00108. The report indicates that Washington searched the car and found roughly $4,000 in cash as well as "green leafy substance and seeds" in the van. *Id.* at MOR 00109. Washington also found "alterations in the van that appeared to used [sic] in the past to haul illegal contraband." *Id.* Dorman and Pearson both signed an "Agreed Final Judgment of Forfeiture" in which they forfeited the money found in the vehicle. Agreed Final Judgment of Forfeiture dated April 20, 2007, at MOR00119-MOR00120, Exhibit A to Response.

Plaintiffs point out that none of the named Plaintiffs had criminal cases filed against them in the Shelby County District Clerk's office. Deposition of Lori Oliver ("Oliver Depo") at 36:8-12 (in summary), 10:21-34:23 (each named Plaintiff discussed), Exhibit 7 to Opening Brief. In fact, all of the named Plaintiffs who hired counsel had their civil forfeiture cases dismissed and the money and property confiscated as part of the interdiction program returned to them. Oliver Depo at 10:21-34:23 (each named Plaintiff discussed individually). Only named Plaintiffs Dorman and Pearson, from whom $4,000 was seized, did not hire counsel and did recover the money Defendants seized from them. *Id.* However, the Shelby County District Clerk testified that Defendants obtained undated waivers of service and agreed judgments from several of the named Plaintiffs, apparently at the time of the seizures, including Dorman, Pearson (Oliver Depo at 21:24-27:12), Boatright, and Henderson (Oliver Depo at 28:23-29:22).

The Plaintiffs allege that the interdiction program is ongoing in Tenaha. As support, they point to the fact that as of April 21, 2010, the date of Walker's deposition as the city's designee,

there had been no changes made to the interdiction program. Walker Depo at 45:17-24. Defendants, however, argue that Defendant Washington is no longer the Constable of Precinct 4, Deposition of Rich Campbell dated May 19, 2010 ("Campbell Depo I") at 22:14-17, Exhibit I to Response, and that Shelby County does not currently operate an interdiction program other than those maintained by municipalities and the DPS. Deposition of Rick Campbell dated August 11, 2010 ("Campbell Depo II") at 23:2-17, Exhibit J to Response.

### B. The Morrow Stop

Named Plaintiff James Morrow ("Morrow") is African American and a proposed class representative. He was stopped, detained, questioned, and his person and car were searched by Defendant Washington on August 31, 2007. In addition, Washington seized $3,969 and two cell phones from Morrow and arrested him. Washington Depo at 169:13-21; *see also* Offense/Incident Report for James Morrow ("Morrow Offense Report") at MOR00212, Exhibit 12 to Opening Brief. Although the traffic summons indicates that Morrow was stopped for failing to drive in a single marked lane, it does not appear that Washington charged Morrow with this traffic offence. *See* Traffic Summons/Notes 29535 ("Morrow Traffic Summons") at MOR 00263, Exhibit 10 to Opening Brief. Instead, Washington charged Morrow with money laundering. *Id*. The Offense Report indicates that Washington smelled "the odor of burned marijuana" in the car and "noticed several burns in seat upholstery and signs of marijuana use." Morrow Offense Report at MOR00211. Washington contacted Constable Whatley and asked him to bring the K-9 Bo. *Id*. A camera in Constable Whatley's vehicle recorded the Morrow stop from the time that Constable Whatley arrived on the scene. Video of Morrow Stop ("Morrow Video"), Exhibit 1 at class certification hearing on November 9, 2011 ("Class Cert.

Hearing"), Disc 1 of 2.  When Constable Whatley arrived on the scene, the following dialogue took place between Washington and Whatley:

> Washington: Would you take your K-9.  If he alerts on the vehicle, I'm gonna take his momma's vehicle away from him, and I'm gonna take his money.
>
> Whatley:  Oh, yeah.  OK.
>
> Washington:  I'm gonna take his stuff from him.
>
> Whatley:  [Chuckles]  OK.

Morrow Video at 00:00:48-00:01:08.

According to the Morrow Offense Report, K-9 Bo alerted on the vehicle.  *Id*. Washington then searched the vehicle and seized roughly $4,000.  *Id*. at MOR00211-213. During the initial search of the vehicle Whatley appears to discover the cash near the glove compartment and chuckles.  Morrow Video at 00:04:20.  A few moments later, Whatley takes the dog to the back of the vehicle and states that the dog alerted "right in there."  *Id*. at 00:05:40. "That may be some sort of a hauling spot.  But you definitely got reasonable suspicion anyway on the funds."  *Id*.  However, neither Washington nor Whatley appear to search that area of the car in any meaningful way to determine if there are, in fact, drugs in the car.  *Id*.  The visibility of the video is somewhat obscured by the placement of Washington's car between the camera and Morrow's car.  Additionally, much of the dialogue is difficult to understand because of the traffic noise on the video.  However, based on the Court's careful review of the video, Whatley and Washington appear to do only a cursory search of the car, find the money, and confirm with each other that they have reasonable suspicion to keep the funds.  Morrow Video.  During the search, the following conversation transpires between Whatley and Washington:

> Whatley:  How much funds he have?

| Washington: | He's gonna have about $4,000 with what he got in his pocket. You know, just nickel and dime stiff. |
| --- | --- |
| Whatley: | Yeah. |

*Id.* at 00:07:50. Whatley then leaves the scene, and the video ends without either Washington or Whatley arresting Morrow.

In his deposition, Washington stated that he confiscated Morrow's money and cell phones because he believed that they were connected to criminal activity. Washington claims that he based this belief on the fact that Morrow had conflicting stories and that there were signs of marijuana use in the car. Washington Depo at 169:22-193:19; *see also* Morrow Offense Report at MOR00211-212. However, Washington did not charge Morrow with a drug offense, and could not explain why signs of marijuana use in the car would link the seized property to illegal activity. *Id.*

Ultimately, Washington's reason for seizing the property and arresting Morrow appears to be the fact that Morrow allegedly told Washington that he was traveling from Little Rock to the Galleria Mall in Houston. *Id.* Washington's belief that the Galleria Mall in Houston is a hotspot for narcotics trafficking and that "[n]ine out of ten arrests in seized currency reveals traffickers pick up narcotics and sell narcotics at the Galleria Mall." *Id.*; Morrow Offense Report at MOR00210-213. Washington also testified that one of reasons he was suspicious of Morrow was because Morrow could not identify the name of the cousin he said he was visiting in Houston. However, the police reports, Washington's own notes, and the video of the stop suggest that Morrow did provide the name of the cousin he was visiting. *Compare* Washington Depo at 171:7-8, 174:24-25, 178:16-20, and 182:7-8 with 190:11-192:9; *see also* Morrow Video at 00:00:01. After his arrest, Morrow hired a lawyer. The money laundering charges were then dropped and the money was returned to Morrow. Letter from Russell to Tim James, Exhibit. 13

to Opening Brief. District Attorney Russell stated in a letter to Morrow's attorney that she believed, after reviewing the offense report, that there was "no probable cause to pursue this matter further" and that she would "not feel comfortable . . . presenting this case to the Grand Jury." *Id*.

### C. The Flores and Parsons Stop

Named Plaintiffs Javier Flores ("Flores") and William Parsons ("Parsons") are proposed class representatives. Flores is Hispanic, but Plaintiffs claim that he appears to some to be African American. Parsons is of Macedonian descent, but Plaintiffs claim that he appears to some to be Hispanic. Flores and Parsons were traveling through Tenaha on July 22, 2008 when they were stopped by Defendant Whatley. The video of the stop indicates that Whatley stopped them for speeding. Video of Flores/Parsons Stop ("Flores/Parsons Video") at 00:00:55, Exhibit 1 at Class Cert. Hearing, Disc 2 of 2, Video 10. After asking Flores to exit the car, Whatley stated: "While I'm waiting on your driver's license, I'm going to just walk my dog around." Flores/Parsons Video at 00:01:57. Defendant Whatley detained Flores and Parsons, questioned them, searched their car, seized $8,400, arrested them, and threatened them with money laundering charges before releasing them. Whately Depo at 204-16-205:4; *see also* Third Amended Complaint at ¶¶ 97-100 (Dkt. No. 111); Whately's Offense/Incident Report of 7.23/08, Exhibit 15 to Opening Brief. Whatley did not charge Flores or Parsons with a traffic offense. Whatley Depo I at 205:5-207:3. Whatley testified that he searched Flores' and Parsons' car because his narcotics dog alerted to drugs. However, no drugs were found in the car. *Id*. at 81:12-82:19 and 208:15-209:9. Whatley did find and seize $8,400 in their luggage in the trunk of the car and charged them with money laundering. *Id*. at 200:17-201:21. Whatley testified that he seized the money because he believed it was contraband based on his training and experience

and the fact that (1) his drug dog alerted to the car, (2) Flores and Parsons seemed uneasey, (3) there were bandanas on the luggage, (4) the clothing in the luggage looked too large for Flores and Parsons, (5) the money was bound by a rubber band and (5) a DEA officer in Pennsylvania identified Flores and Parsons as a "meth and ice dealer." *Id.* at 207:4-208:9, 209:16-211:4, 207:4-214:14, 214:7-217:5, and 202:1-15. At the scene of the traffic stop, Washington told both Flores and Parsons that they were being detained for "possession of money laundering." Flores/Parsons Video at 00:33:35. After Flores and Parsons were taken back to the police station, Washington told them that they were being detained but that he could not tell them what the charges were unless they were arrested. Flores/Parsons Video at 00:42:50. Washington indicated that the reason they were being detained was because of "discrepancies on - - about - - about the amount of money and placement of the money and different things like that." Flores/Parsons Video at 00:42:17. Whatley concluded that the money seized was connected to unspecified narcotics activity in Pennsylvania, based on his experience and training. However, Whatley never identified what kind of narcotics activity, what kind of drugs were involved, and never asked the authorities in Pennsylvania if they had any reason to think there was a connection. *Id.* The Court's review of the video record of Flores and Parson's stop and arrest also indicates that Whatley was not aware of the rumors of Flores' or Parsons' alleged connection to drug activity at the time Whatley searched the car, seized the money, and detained the men. Flores/Parson Video at 00:00:01 to 01:32:50. The video of the stop also shows that Defendant Washington arrived at the scene while Whatley was searching the car; however, Washington did not actively participate in the search. *See* Flores/Parsons Video at 00:20:30. Flores and Parsons were no-billed by a grand jury and District Attorney Russell returned the seized money. Letter from Russell to John Smith, Exhibit 16 to Opening Brief.

## II. Discussion

The class certification determination rests within the sound discretion of the trial court, exercised within the constraints of Federal Rule of Civil Procedure 23. *Oscar Private Equity Invs. v. Allegiance Telecom, Inc.*, 487 F.3d 261, 264 (5th Cir. 2007). The party seeking certification bears the burden of establishing that all requirements of Rule 23 have been satisfied." *Unger v. Amedisys Inc.*, 401 F.3d 316, 320 (5th Cir. 2005). "Rule 23 does not set forth a mere pleading standard. A party seeking class certification must affirmatively demonstrate his compliance with the Rule—that is, he must be prepared to prove that there are *in fact* sufficiently numerous parties, common questions of law or fact, etc." *Wal-Mart*, 131 S.Ct. at 2551 (original emphasis). Before granting certification, a court must conduct a rigorous analysis to determine whether the plaintiffs have met the Rule 23 requirements. *Castano v. Am. Tobacco Co.*, 84 F.3d 734, 740 (5th Cir. 1996). "[S]ometimes it may be necessary for the court to probe behind the pleadings before coming to rest on the certification question," and the "rigorous analysis" required of the court may "entail some overlap with the merits of the plaintiff's underlying claim." *Wal-Mart*, 131 S.Ct. at 2551 (quotation and citations omitted). However, a district court cannot deny certification based on its belief that the plaintiff could not prevail on the merits. *Castano*, 84 F.3d at 744 (citing *Miller v. Mackey Int'l*, 452 F.2d 424, 427 (5th Cir. 1971)). The Court has an independent duty to determine the propriety of the class certification and is not limited to the arguments made by the parties. *See Daniels v. City of New York*, 196 F.R.D. 409, 413 n.5 (S.D.N.Y. 2001); *Anderson v. Cornejo*, 2000 WL 286902, at *3 (N.D. Ill. 2000). Because a district court maintains great discretion in certifying and managing a class action, a district court's decision to certify a class will be reversed only upon a showing that the court abused its discretion, or that it applied incorrect legal standards in reaching its decision. *James v. City of Dallas, Texas*, 254 F.3d 551, 562 (5th Cir. 2001).

## A.  Adverse Inferences

Before analyzing the requirements of Rule 23, the Court will address two issues that were raised in the class certification briefing regarding whether the Court should draw adverse inferences from (1) the failure of Tenaha and the Constable's Office to collect and report racial profiling information as required by Texas law and (2) Defendant Russell's and Defendant Green's refusal to answer questions during their depositions on Fifth Amendment grounds.

### 1.  Adverse Inference based on Failure to Maintain Racial Profiling Information

First, the Court will consider whether to draw an adverse inference from the failure of Tenaha's law enforcement agencies to collect and report racial profiling evidence, as required by Texas Law.  Plaintiffs argue that this failure supports an inference that the Defendants were actively attempting to conceal evidence regarding the discriminatory aspects of the interdiction program.  At the very least, however, Plaintiffs argue that this failure should excuse any perceived deficiencies in the statistical analysis.  The Court agrees.

Texas Law requires that all law enforcement agencies adopt a "detailed written policy on racial profiling" that requires the agency to collect racial profiling information for all traffic stops, arrests, and searches and seizures, as well as report racial profiling information to the governing bodies served by the agency.  TEX. CODE CRIM. PRO. § 2.132(b)(6) and (7) (2001).[2] The evidence clearly demonstrates that Tenaha's law enforcement agencies did not comply with these statutory requirements.  Defendant Whatley testified, and Defendants do not dispute, that the Precinct 4 Constable's office of Shelby County is a law enforcement agency, but that he did not have a racial profiling policy or report the racial profiling information to the County.  Whatley Depo I at 133:1-136:13.  Whatley also testified that he was aware of no way to

---

[2] This section of the Texas Code of Criminal Procedure was amended in 2009, but the relevant provisions are the same.  *See* TEX. CODE CRIM. PRO. § 2.132(b)(6) and (7) (2009).

determine if he was disproportionately stopping members of ethnic groups. *Id.* The statistical evidence that has been produced in this case, the Tier 1 data provided by the Tenaha police department, appears to be the only racial profiling information kept by any of Tenaha's law enforcement agencies. This Tier 1 data includes information about the racial make-up of stops made in Tenaha, but not the required information on detentions, searches, or seizures. *See* Tier 1 Data. Accordingly, it is undisputed that both the Tenaha police department and constable's office failed to collect racial profiling information that they were required by law to collect and report and that would have clearly shown the impact of the interdiction program on racial and ethnic minorities. Under these circumstances, the Court is persuaded that the failure of the Tenaha police department and the constable's office to collect, report, and maintain racial profiling information gives rise to an inference that this failure was the result of an attempt to conceal the illegal targeting of racial and ethnic minorities for stops, detentions, arrests, searches, and seizures as part of the interdiction program. To hold otherwise would allow law enforcement agencies, counties, and municipalities to avoid liability for discriminatory practices by choosing not to maintain records related to those practices.

### 2. Adverse Inference based on Defendants Russell's and Defendant Green's Assertion of the Fifth Amendment

Next, the Court will address the issue of whether to draw an adverse inference for purposes of class certification based on Defendant Russell's and Defendant Green's assertion of the Fifth Amendment and refusal to answer questions during their depositions on class certification issues. On April 15, 2010, the Court stayed discovery as to defendants Russell and Green for 90 days due to indications that both were subject to pending criminal investigations related to the same facts and circumstances giving rise to this lawsuit (Dkt. No. 149). Upon the expiration of the 90 day stay, both Defendants Russell and Green requested a further stay of

discovery directed towards them until the conclusion of the criminal investigations into their activity (Dkt. Nos. 167 and 169).  On July 10, 2010, the Court issued an order denying both motions for protection.  (Dkt. No. 177).  The Court reasoned that (1) neither Russell nor Green provided any evidence that they were currently under indictment or that indictments against them were imminent or even certain; (2) staying discovery toward them would result in an indefinite delay in the proceedings and prejudice the Plaintiffs; and (3) the public interest would best be served by the prompt resolution of the case.  In its order denying the stay, the Court ruled that it would "limit any adverse inference arising from either defendant's decision to invoke his or her Fifth Amendment right to class certification issues."  At their depositions, both Russell and Green refused to answer *any* questions whatsoever, other than identifying themselves by name, based on their Fifth Amendment right against self incrimination.  *See* Deposition of Lynda K. Russell ("Russell Depo"), Exhibit 1 to Plaintiffs' Supplemental Motion for Class Certification ("First Supp. Motion") (Dkt. No. 194); Deposition of Danny Green ("Green Depo"), Exhibit 2 to First Supp. Motion.

"[W]hile a person may refuse to testify during civil proceedings on the ground that his testimony might incriminate him ... his refusal to testify may be used against him in a civil proceeding." *Hinojosa v. Butler*, 547 F.3d 285, 292 (5th Cir. 2008) (quoting *Farace v. Indep. Fire Ins. Co.*, 699 F.2d 204, 210 (5th Cir.1983)).  It is well settled that "the Fifth Amendment does not forbid adverse inferences against parties to civil actions when they refuse to testify in response to probative evidence offered against them." *Baxter v. Palmigiano*, 425 U.S. 308, 318, 96 S.Ct. 1551, 47 L.Ed.2d 810 (1976).  However, whether or not to permit such an adverse inference in a civil case is left to the discretion of the district court. *Hinojosa*, 547 F.3d at 291-92 (quoting *FDIC v. Fid. & Deposit Co.*, 45 F.3d 969, 977 (5th Cir. 1995)).

Plaintiffs argue that Russell's and Green's assertion of their Fifth Amendment right against self incrimination to every substantive question asked at their depositions justifies the Court drawing an adverse inference on the issues of numerosity, commonality, typicality, adequacy, and whether Defendants acted on grounds that apply generally to the members of the proposed class. Defendants, however, argue that it would be prejudicial for the Court to draw an adverse inference against *all* of the Defendants because only Russell and Green invoked their Fifth Amendment right against self incrimination. Additionally, Defendants argue that, as a practical matter, there is no way for the Court to draw an adverse inference against Russell and Green without that adverse inference likewise being drawn against all of the Defendants. There is ample evidence, however, that the Defendants acted in concert with respect to the interdiction program. For example, Whatley testified that he and Washington called the District Attorney's office during interdiction stops to determine whether to release the individuals, arrest them, seize their property, or return property that had already been seized. Whatley Depo I at 163:21-168:19. Whatley also testified that Russell had an agreement with the Tenaha Marshal's office and the Constable's office on what percentage of the seizures the District Attorney would get. Whatley Depo I at 148:3-21. Because the evidence suggests that all of the Defendants acted in concert with respect to the interdiction program, the Court finds that there is no prejudice in applying any adverse inference drawn from Russell's and Green's refusal to answer questions to all of the Defendants.

Defendants further argue that because the merits of Plaintiffs' case do not turn on class certification, the questions related to class certification are not the type of probative evidence that can be the basis for an adverse inference. The Court is not persuaded by Defendants' argument.

Russell and Green refused to answer questions regarding:

- the interdiction program and what role the District Attorney's office played in the interdiction program, *see* Russell Depo at 39-43; Green Depo at 32-35;

- the number of citizens who were affected by the interdiction program, *see* Russell Depo at 82-84; Green Depo at 52-53;

- whether the treatment of Morrow, Flores, and Parsons was typical of others subject to the interdiction program, *see* Russell Depo at 80-82; Green Depo at 49-50;

- what type of records are kept by the district attorney's office regarding cases that are presented for the filing of criminal charges; *see* Russell Depo at 9-10;

- racial profiling, *see* Russell Depo at 50-52 and 80; Green Depo at 39;

- traffic stops, *see* Russell Depo at14, 41, 48-49, 60, 111-12, and 118; Green Depo at 38-39;

- detentions, *see* Russell Depo at 52 and 119; Green Depo at 40 and 72-73;

- searches, *see* Russell Depo at 54-55, 61, and 119; Green Depo at 40 and 73;

- seizures, *see* Russell Depo at 57-59, 110, and 120; Green Depo at 41-43;

- arrests, *see* Russell Depo at56-58, 67, and 120; and

- expenditure of forfeiture funds, *see* Russell Depo at 96-117; Green Depo at 33 and 64-72.

Russell also cited her right against self incrimination and refused to answer the question: "You discussed with Barry Washington and Randy Whatley how to make racially-motivated stops and make those stops appear legal, didn't you?" *See* Russell Depo at 118:18-20. These topics, and the questions asked by Plaintiffs with respect to these topics, are highly probative of the issue of class certification. Defendants attempt to downplay the significance of Russell's and Green's refusal to answer these questions by pointing out that Russell and Green participated in other forms of discovery—i.e. they provided documentary evidence. However, as discussed earlier, Tenaha and Shelby County failed to collect the required racial profiling data, and, thus, this highly probative information could not be obtained through documentary evidence. In addition, Whatley testified that he was aware of no way to determine if he was disproportionately stopping

members of ethnic groups. Whatley Depo I at 133:1-136:13. Accordingly, much of the highly relevant information sought from Russell and Green during their depositions—i.e. whether those stopped, detained, arrested, searched, or whose property was seized pursuant to the interdiction program were disproportionately minorities—was not available through alternative forms of discovery.

Finally, Defendants argue that because the actions of Whatley and Washington directly relate to class certification issues, Russell's and Green's testimony is irrelevant to class certification. Russell and Green did not maintain, however, that they had no relevant information in response to Plaintiffs questions. To the contrary, they responded that they were refusing to answer Plaintiffs' questions—which related to class certification—because their answers might incriminate them. The implication is that Russell and Green had information relevant to the issues of class certification but that they withheld the information because they feared it would be incriminating.

Accordingly, the Court concludes that it is appropriate to draw an adverse inference on the issues of numerosity, commonality, typicality, adequacy, and whether Defendants acted on grounds that apply generally to the members of the proposed class from Russell's and Green's refusal to answer questions on Fifth Amendment grounds.

**B.  Adequacy of Class Definition**

The Fifth Circuit has held that the existence of an ascertainable class of persons to be represented by the proposed class representative is an implied prerequisite of Federal Rule of Civil Procedure 23. *See John v. National Sec. Fire & Cas. Co.*, 501 F.3d 443, 445, n.3 (5th Cir. 2007) ("It is elementary that in order to maintain a class action, the class sought to be represented must be adequately defined and clearly ascertainable") (quoting *DeBremaecker v. Short*, 433

F.2d 733, 734 (5th Cir. 1970)).  The proposed class must be clearly defined so that it is administratively feasible for the Court to determine whether a particular individual is a member. *Daniels*, 198 F.R.D. at 414 (citing *Rios v. Marshall*, 100 F.R.D. 395, 403 (S.D.N.Y. 1983) (quoting 7 Charles Alan Wright & Arthur R. Miller, Federal Practice and Procedure § 1760 at 581 (1972)).  The Court must be able to make this determination without having to answer numerous fact-intensive questions.  *Id.*  (quoting *Williams v. Glickman*, 1997 U.S. Dist. LEXIS 1683, at *13 (D.D.C. 1997)); *see also Crosby v. Social Sec. Admin.*, 796 F.2d 576, 580 (1st Cir. 1986) (explaining that a class definition should be based on objective criteria so that class members may be identified without individualized fact finding).  "A class definition is inadequate if a court must make a determination of the merits of the individual claims to determine whether a particular person is a member of the class."  James Wm. Moore et al., Moore's Federal Practice ¶ 23.21[3][c] (3rd ed. 2007).

### 1.  Plaintiffs' Proposed Class Definition

Plaintiff's proposed class consists of people who:

1. Are, or appear(ed) to be, members of racial or ethnic minority groups and those in their company, and

2. Were, or will be, traveling in, through, or near Tenaha at any time after October 2006, and subject to the Defendants' interdiction program,

3. Were or are subject to being stopped, detained and/or arrested by one or more of the Defendants without articulable suspicion of criminal activity, and/or

4. Were or are questioned and/or their vehicle was or is searched by one or more Defendant, without an articulable suspicion of criminal activity, to find valuable property or money.

Defendants contend that Plaintiffs' proposed class definition is too vague and does not adequately define the boundaries of those included in the proposed class.  Although the Court does not agree with all of the Defendants' arguments, the Court does agree that Plaintiffs' class

definition is imperfect. For example, Plaintiff's proposed definition would require the Court to clearly define the interdiction program to identify class members. Defendants also object to defining the class based on whether "an articulable suspicion of criminal activity" exists. The Court proposed this language in an earlier order based, in part, on the Southern District of New York's certification of a similar class with a definition based on "the absence of the reasonable articulable suspicion of criminal activity." *See Daniels v. City of New York*, 198 F.R.D. 409, 412 (S.D.N.Y. 2001); *see also* Order dated August 20, 2009, Dkt. No. 86. However, the factual record developed as part of the briefing and argument on the motion for class certification establishes that proposed class representatives Morrow, Parsons, and Flores are not members of such a class. For example, the evidence indicates that Defendants had "an articulable suspicion of criminal activity" with respect to the detention, arrest, and search of proposed class representative Morrow as well as the subsequent seizure of his property. The Morrow Offense Report indicates that Defendant Washington smelled "the odor of burned marijuana" in the car, "noticed several burns in seat upholstery and signs of marijuana use," and that Defendant Whatley's drug dog alerted on Morrow's car. Morrow Offense Report at MOR00211. Defendant Washington also testified that he confiscated Morrow's money and cell phones because Washington believed that Morrow's conflicting stories and the signs of drug use in the car suggested that the property was related to criminal activity. Washington Depo at 169:22-193:19; Morrow Offense Report at MOR00211-212l. Although the Court believes that these alleged explanations likely do not rise to the level of *reasonable* articulable suspicion justifying the actions of Whatley and Washington given the surrounding circumstances, they do meet the requirements of "articulable suspicion" in the proposed class definition. Accordingly, Morrow is not a member of the proposed class as currently defined.

Likewise, the Defendants have provided "an articulable suspicion of criminal activity" with respect to the detentions and searches of proposed class representatives Parsons and Flores as well as the seizure of their property. Defendant Whatley testified that he searched Flores and Parsons' car because his narcotics dog alerted on the car. Whatley Depo I at 209:1-7. Whatley also testified that he seized the money because he believed it was contraband based on this training and experience and the fact that (1) his drug dog alerted to the car, (2) Flores and Parsons seemed uneasey, (3) there were bandanas on the luggage, (4) the clothing in the luggage looked too large for Flores and Parsons, (5) the money was bound by a rubber band and (5) a DEA officer in Pennsylvania identified Flores and Parsons as a "meth and ice dealer." *Id.* at 207:4-208:9, 209:16-211:4, 207:4-214:14, 214:7-217:5, and 202:1-15. As with the Morrow stop, the Court's review of the entire record reveals numerous inconsistencies and suggests that Defendant Whatley's actions with respect to Flores and Parsons may not have been legally justified. However, the "articulable suspicion" standard in the proposed class definition was designed to avoid the need for individualized determinations as to the reasonableness of each detention, arrest, search, and seizure. *See* Order dated August 20, 2009, Dkt. No. 86. Because Defendants have demonstrated "an articulable suspicion of criminal activity" with respect to the treatment of Flores and Parsons, they are not members of Plaintiffs' proposed class as currently defined.

To certify a class under Rule 23, plaintiffs must show they are members of the class. *See Forbush v. J.C. Penney Co*., 994 F.2d 1101, 1105 (5th Cir.1993). Accordingly, certifying a class of which the proposed class representatives are not members, such as Plaintiffs' proposed class, is inappropriate.

### 2. The Court's Modified Class Definition

However, the flaws in Plaintiffs' proposed class definition are not fatal to class certification of any class based on Defendants' alleged misconduct, only to the specific class definition proposed by Plaintiffs. "District courts are permitted to limit or modify class definitions to provide the necessary precision." *In re Monumental Life Ins. Co.*, 365 F.3d 408, 414 (5th Cir. 2004) (citing *Robidoux v. Celani*, 987 F.2d 931, 937 (2nd Cir.1993) ("A court is not bound by the class definition proposed in the complaint and should not dismiss the action simply because the complaint seeks to define the class too broadly"); *Harris v. Gen. Dev. Corp*., 127 F.R.D. 655, 659 (N.D. Ill. 1989) ("[I]t is certainly within this court's discretion to limit or redefine the scope of the class"); *Meyer v. Citizens & S. Nat'l Bank*, 106 F.R.D. 356, 360 (M.D. Ga. 1985) ("The Court has discretion in ruling on a motion to certify a class. This discretion extends to defining the scope of the class.")). The Court, therefore, modifies the class definition as follows:

> (1) People who are, or appear to be, members of racial or ethnic minority groups and those in their company, and
>
> (2) Were, or will be, traveling in, through, or near Tenaha at any time after November 1, 2006, and
>
> (3) Were, or are, subject to being stopped by one or more Defendant for an alleged traffic violation.

Defendants have argued that the inclusion of those who were merely stopped as part of the interdiction program is overbroad because the stops themselves are not actionable. Defendants rely heavily on the Supreme Court's decision in *Whren v. United States* to support their assertion that the traffic stops at the heart of Plaintiffs' case cannot be discriminatory so long as the stops were the result of actual traffic violations. *See* 517 U.S. 806 (1996). In *Whren*, the Supreme Court held that the constitutional reasonableness of traffic stops under the Fourth

Amendment does not depend on the actual motivations of the individual officers involved. *Id*. at 812-13. Based on this principle, the court rejected a claim that a traffic stop violated the Fourth Amendment's prohibition against unreasonable searches and seizures unless a reasonable officer would have been motivated to stop the car by a desire to enforce the traffic laws. *Id*. at 813-18. While the Supreme Court made it clear that the subjective motivations of an officer have no bearing on the reasonableness of a search under the Fourth Amendment—the only constitutional claim at issue in *Whren*—it also clarified that racially motivated traffic stops would run afoul of the Equal Protection Clause of the Fourteenth Amendment. *Id*. "The Constitution prohibits selective enforcement of the law based on considerations such as race." *Id*. at 813. Thus, under *Whren*, targeting racial minorities for enforcement of traffic laws is a violation of the Equal Protection clause of the Fourteenth Amendment. In other words, the fact that class members may have committed traffic violations will not absolve the Defendants under the Equal Protection Clause of the Fourteenth Amendment if the Defendants targeted racial minorities in enforcing the traffic laws. Accordingly, *Whren* supports the inclusion of those members of racial and ethnic minorities stopped as part of the interdiction program because Plaintiffs allege that the Defendants targeted racial and ethnic minorities for selective enforcement of traffic laws in violation of the Equal Protection Clause of the Fourteenth Amendment.

Defendants also oppose the inclusion in the class of those who may in the future be subject to the interdiction program. Although those who may be stopped while traveling through Tenaha at some point in the future are not capable of being specifically identified, this is not a bar to certification of a Rule 23(b)(2) class. The Advisory Committee Notes for Rule 23(b)(2) make it clear that specific enumeration of every member of a (b)(2) injunctive class is not necessary because the illustrative cases for this subdivision "are various action in the civil-rights

field where a party is charged with discriminating unlawfully against a class, usually one *whose members are incapable of specific enumeration*." FED. R. CIV. P. 23(b)(2) 1966 Advisory Committee's Note (emphasis added). Based on this, the district court in *In re Cincinnati Policing* certified an injunctive settlement class of "African-American or Black persons and people perceived as such who reside, work in and/or travel on public thoroughfares in the City of Cincinnati, Ohio either now or in the future and who are stopped, detained, or arrested by Cincinnati Police Officers . . ." in a suit against the city of Cincinnati and two of its police officers alleging racially discriminatory enforcement practices by the city police department. 209 F.R.D. 395, 397-400 (S.D. Oh. 2002).

Accordingly, the Court finds that the proposed Rule 23(b)(2) class, as described in the Court's modified class definition, is adequately defined and clearly ascertainable.

### C. Rule 23 Requirements

Once the class is adequately defined, plaintiffs must show that the proposed class meets all of the requirements of Rule 23. Under Rule 23(a), the party seeking certification must demonstrate that

> (1) the class is so numerous that joinder of all members is impracticable [numerosity];
>
> (2) there are questions of law or fact common to the class [commonality];
>
> (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class [typicality]; and
>
> (4) the representative parties will fairly and adequately protect the interests of the class [adequacy].

FED. R. CIV. P. 23(a); *Wal-Mart*, 131 S.Ct. at 2548.

Second, the proposed class must satisfy at least one of the three requirements listed in Rule 23(b). Plaintiffs rely on Rule 23(b)(2), which applies when "the party opposing the class

has acted or refused to act on grounds that apply generally to the class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole." FED. R. CIV. P. 23(b)(2).

### 1. Rule 23(a) Requirements

#### a) Numerosity

To satisfy the numerosity requirement, the court must inquire whether the class is so numerous that joinder of all members is impracticable. *See Watson v. Shell Oil Co*., 979 F.2d 1014, 1022 (5th Cir. 1992). The plaintiff need not establish the exact number of potential class members to meet the numerosity requirement. *Smith v. Texaco, Inc*., 88 F.Supp.2d 663, 674 (E.D. Tex. 2000), vacated on other grounds 281 F.3d 477 (5th Cir. 2002); Newberg on Class Actions, § 3.5 (4th ed.); *Barragan v. Evanger's Dog and Cat Food Co., Inc*., 259 F.R.D. 330, 333 (N.D. Ill. 2009) ("a plaintiff does not need to demonstrate the exact number of class members as long as a conclusion is apparent from good-faith estimates"). To determine whether the numerosity requirement has been met, the court "must not focus on sheer numbers alone but must instead focus on whether joinder of all members is practicable in view of the numerosity of the class and all other relevant factors." *Pederson*, 213 F.3d at 868 (internal citations omitted). Other relevant factors include the geographical dispersion of the class, the ease with which class members may be identified, the nature of the action, and the size of each plaintiff's claim. *Zeidman v. J. Ray McDermott & Co., Inc.*, 651 F.2d 1030, 1038 (5th Cir. 1981); *Smith*, 88 F. Supp. 2d at 674. No definite standard exists as to the size of class that satisfies the numerosity requirement. *Garcia v. Gloor*, 609 F.2d 156, 160 (5th Cir. 1980). However, the Fifth Circuit has held that a class consisting of 100 to 150 members is "within the range that generally satisfies the numerosity requirement." *Mullen v. Treasurer Chest Casino, LLC*, 186 F.3d 620, 624 (5th Cir.

1999) (citing 1 Newberg on Class Actions § 3.05, at 3-25 (3d ed.1992) (suggesting that any class consisting of more than forty members "should raise a presumption that joinder is impracticable")). In the absence of any definitive pattern for numerosity in terms of the number of purported class members, the Fifth Circuit has left the numerosity determination to the sound discretion of the district court in controlling its litigation. *Zeidman*, 651 F.2d at 1038-39.

Tenaha's Tier 1 racial profiling data indicates that between 2007 and 2009, 829 non-Caucasians were stopped under the interdiction program. Tier 1 Data, Ex. 17 to Opening Brief. This number is significantly higher than the 100 to 150 range that the Fifth Circuit holds is within the range that generally satisfies the numerosity requirement. *Mullen*, 186 F.3d at 624. Even taking the lower end of the estimated number of class members, numerosity exists. Defendant Whatley estimated that he stopped upwards of 500 or possibly 1,000 people, and Washington estimated that he stopped at least 100 people during the relevant time period.[3] The Tier 1 racial profiling data indicates that from 2007 to 2009, anywhere from 22.8 % to 51.9% of the interdiction stops were of non-Caucasians.[4] Applying the lowest possible number of stops based on Whatley's and Washington's testimony—600—and applying the lowest percentage of minority stops for the time period—22.8%[5]—there would still be roughly 136 class members. In

---

[3] Defendants Whatley and Washington were responsible for most of the traffic stops in the interdiction program. Whatley I Depo at 159:14-21.Whatley testified that the interdiction program involved upwards of 500 or possibly 1,000 people, and Washington testified that he stopped more than 100 people during the interdiction program but could not say if that number was more or less than 500. *See* Whatley Depo I at 158:1-8 and 160:3-7; Washington Depo at 124:21-126:11. However, neither Whately nor Washington could estimate the proportion of non-Caucasians included in these stops. Washington Depo at 126:12-17; Whatley Depo I at 160:8-17. Additionally, the City of Tenaha's 30(b)(6) designee on the interdiction program and the number of apparent minorities stopped, City Marshal Fred Walker, did not know how many people have been stopped as a result of the interdiction program since July 2006, the ethnicity of the people who were stopped, or the proportion of those stopped who were ethnic minorities. Walker Depo at 81:20-82:11. Accordingly, the only reliable information regarding the number of racial and ethnic minorities stopped under the interdiction program is the Tier 1 racial profiling data.
[4] The Tier 1 data indicates that 51.9% of those stopped in 2007 were racial and ethnic minorities and 45.7% of those stopped in 2008 were racial and ethnic minorities. In 2009, after the lawsuit was filed, the percentage of racial and ethnic minorities stopped dropped to 22.8% of the total stops. *Id.*
[5] This number represents the percentage of racial and ethnic minorities stopped under the interdiction program in 2009, after this lawsuit was filed.

*Mullen*, the Fifth Circuit upheld a district court's finding of numerosity of a class with approximately 100-150 members where the district court reasonably inferred that some of the class members would be geographically dispersed and, thus, that joinder of them would be impractical. 186 F.3d 620, 624 (5th Cir. 1999). Because the class members are travelers on an interstate highway, U.S. 59, the class members are likely to be geographically dispersed, further indicating that joinder is impracticable. For example, six of the ten named plaintiffs—Morrow, Watson, Busby, Dismukes, Dorman, and Pearson—are from out-of-state. *See* Third Amended Complaint, ¶¶ 5-10 (Dkt. No. 111). Therefore, it is abundantly clear that the numerosity requirement has been met with respect to the class.

### b) Commonality

The Supreme Court recently clarified the standard for determining whether commonality exists under Rule 23(a)(2). *See Wal-Mart*, 131 S.Ct. at 2551-2557.

> Commonality requires the plaintiff to demonstrate that the class members have suffered the same injury. This does not mean that they have all suffered a violation of the same provision of law. . . . Their claims must depend upon a common contention—for example, the assertion of discriminatory bias on the part of the same supervisor. That common contention, moreover, must be of such a nature that it is capable of classwide resolution—which means that determination of its truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke.

*Id.* at 1551 (internal citations and quotations omitted). Accordingly, the commonality analysis "requires the court to determine (1) whether the class members' claims 'will in fact depend on the answers to common questions,' and (2) whether classwide proceedings have the capacity to 'generate common answers apt to drive the resolution of the litigation,'" *United States v. City of New York*, 2011 WL 2680474, at * 3 (S.D.N.Y. 2011) (quoting *Wal-Mart*, 131 S.Ct. at 2554 and 2551, respectively) (additional citations and quotations omitted)). Answering these questions will necessarily overlap somewhat with Plaintiffs' merits contention that Tenaha's interdiction

program constitutes a pattern and practice of discrimination against members, or those who appear to be members, of a racial or ethnic minority, and their passengers, by targeting these individuals for illegal stops, detentions, arrests, and/or searches and seizures. *See Wal-Mart*, 131 S.Ct. at 2552 ("In this case, proof of commonality necessarily overlaps with respondents' merits contention that Wal-Mart engages in *a pattern or practice* of discrimination") (original emphasis). To demonstrate commonality, Plaintiffs must have "significant proof" that Tenaha's interdiction program operates as a "general policy of discrimination." *Id*. at 2553.

In *Wal-Mart*, the Supreme Court reversed certification of a class of former and current female employees of Wal-Mart who brought a Title VII class action against Wal-Mart alleging sex discrimination in Wal-Mart's pay and promotion practices. The Supreme Court's decision rested, in part, on the plaintiffs' failure to satisfy the commonality requirement of Rule 23(a). The plaintiffs in *Wal-Mart* did not allege that Wal-Mart had an express corporate policy against the advancement of women. Instead, the allegation was that the lack of a uniform hiring policy led to broad discretions on the part of local managers in pay and promotion decisions. Because the local managers were susceptible to systemic gender biases in the Wal-Mart culture, the local managers' discretion over pay and promotions was, according to the plaintiffs, exercised disproportionately in favor of men, leading to an unlawful disparate impact on female employees. *Wal-Mart*, 131 S.Ct. at 2548. The Supreme Court rejected the argument that a lack of a company-wide policy regarding hiring could be considered to be a pattern or practice of discrimination, at least where plaintiffs provided no substantiation of systematic discrimination beyond anecdotal evidence and flawed statistical analysis. "In a company of Wal-Mart's size and geographical scope, it is quite unbelievable that all managers would exercise their discretion in a common way without some common direction." *Id*. at 2555. The evidence provided by

Wal-Mart consisted of: (1) the testimony of a sociological expert that Wal-Mart's corporate culture made it vulnerable to gender bias—although that expert could not say with any certainty what percentage of Wal-Mart's employment decisions were based on stereotypical thinking; (2) testimony from another expert that Wal-Mart promotes a lower percentage of women than its competitors; and (3) anecdotal evidence of allegedly discriminatory employment decisions by certain individuals at a proportionately small number of Wal-Mart stores. *Id*. at 2554-56. The Supreme Court held that this evidence did not rise to the level of significant proof that Wal-Mart operated under a general policy or practice of discrimination, as required to satisfy the commonality requirement of Rule 23(a), especially given Wal-Mart's announced policy forbidding sex discrimination in hiring, pay, and promotion decisions, and that Wal-Mart imposed penalties for denial of equal employment opportunities. *Id*. at 2553. "Because respondents provide no convincing proof of a companywide discriminatory pay and promotion policy, we have concluded that they have not established the existence of any common question." *Id*. at 2556-57.

The facts of this case are quite different from *Wal-Mart*. Unlike *Wal-Mart*, this is not a case where the Plaintiffs are attempting to use anecdotal evidence of discriminatory treatment by individuals in a few locations as evidence that a nation-wide policy of discrimination is implemented by the discretionary decisions of thousands of individuals at thousands of locations all across the country. Plaintiffs allege that there was a specific, city-wide policy in Tenaha of targeting racial and ethnic minorities for traffic stops and then illegally detaining and/or arresting them or conducting illegal searches and seizures of their property, i.e. the interdiction program. Plaintiffs further allege that the interdiction program was conceived and implemented by a small number of Tenaha police officers and city officials working in concert during a specified time

period. While the statistical evidence presented by Plaintiff is not perfect, it clearly shows that the proportion of minorities stopped in Tenaha increased dramatically once the interdiction program was instituted. The increase in the number of minorities stopped under the interdiction program was so remarkable that it is statistically impossible that it was the result of anything other than a decision to target racial and ethnic minorities. Additionally, as *Wal-Mart* emphasized, "'[c]ivil rights cases against parties charged with unlawful, class-based discrimination are prime examples' of what (b)(2) is meant to capture." *Id*. at 2557 (quoting *Amchem Products, Inc. v. Windsor*, 521 U.S. 591, 614 (1997)). This is just such a case.

Applying standard announced in *Wal-Mart*, the commonality is satisfied. Plaintiffs have offered "significant proof" that Tenaha's interdiction program operates as a "general policy of discrimination." *Wal-Mart*, 131 S.Ct. at 2553. First, Plaintiffs have offered statistical evidence that the number of racial and ethnic minorities stopped in and around Tenaha increased dramatically when the interdiction program was implemented. From 2003 through 2006, an average of about 32% of Tenaha's traffic stops were of non-Caucasians. In 2007, however, the first full year of the interdiction program, the proportion of non-Caucasians increased dramatically to between 46.8% and 51.9%. The percentage of non-Caucasians stopped in 2008 was 45.7%. Plaintiffs argue that when this difference is statistically analyzed, the probability of the increase occurring as a matter of random chance approachs zero. Plaintiffs also argue that the increase remains similarly significant for 2008, where the number of non-Caucasians stopped was 45.7%. The percentage of non-Caucasians dropped precipitously in 2009 after the commencement of this lawsuit to 22.8%. *Id*. The statistical analysis shows the statistical significance or number of standard deviations, and probability of the increase in proportions of non-Caucasians stopped in Tenaha after the Defendants began the interdiction program. For

2007, the standard deviation is 10.92 or 10.85, and for 2008, the standard deviation is 6.56. *See* Tier 1 data. Plaintiff argues that these numbers indicate that it is highly unlikely that the increase in the proportion of non-Caucasians stopped once the interdiction program began in late 2006 could occur randomly. *See Casteneda v. Partida*, 430 U.S. 482, 496 n.17 (1977) ("As a general rule for such large samples, if the difference between the expected value and the observed number is greater than two or three standard deviations, then the hypothesis that the jury drawing was random would be suspect to a social scientist.").

Defendants, however, question the validity of Plaintiffs' statistical analysis and argue that it is inadequate because it does not compare the general racial and ethinic make-up of all motorists traveling in, near, or though Tenaha with the racial and ethnic make-up of those who were stopped as part of the interdiction program. In support of their argument, Defendants point to the Seventh Circuit's decision in *Chaves v. The Illinois State Police*, 251 F.3d 612 (7th Cir. 2001). The plaintiffs in *Chaves* presented evidence that a disproportionate number of African-Americans and Hispanics were stopped as related to the general ethnic proportions of the State of Illinois. *See id.* The Court found that the statistical evidence was lacking because statistics showing the general ethnic proportions of the State of Illinois did not necessarily reflect the racial makeup of motorists on Illinois highways. *Id.* at 645. However, this case is readily distinguishable from *Chaves*. Plaintiffs do not argue that the proportion of non-Caucasians stopped under the interdiction program is statistically significant because it differs from the proportion of non-Caucasians in the population generally either in the State of Texas or of travelers on the highway, as in *Chaves*. Instead, Plaintiffs argue that the proportion of non-Caucasians to Caucasians stopped under the interdiction program is statistically significant

because it varies so dramatically from the proportion of non-Caucasians to Caucasians stopped in *the same area* before the implementation of the interdiction program.

In addition to the statistical analysis, Plaintiffs have provided anecdotal evidence that the stops of class representatives Morrow, Flores, and Parsons were discriminatory and were based not on a desire to curb illegal activity, but on racial profiling and Defendants' desire to enrich themselves and their offices.

Finally, as discussed previously, the Court finds that the failure of Tenaha and the constable's office to collect, report, and maintain racial profiling information, as required by Texas law, gives rise to an inference that this failure was the result of an attempt to conceal the illegal targeting of racial and ethnic minorities for enforcement of the interdiction program. This, coupled with the adverse inference drawn from the refusal of Defendants Russell and Green to answer relevant questions based on the Fifth Amendment suggests that Defendants created an illegal practice of targeting racial and ethnic minorities for pretextual traffic stops as part of the interdiction program—i.e. that Tenaha's interdiction program operates as a general policy of discrimination.

Based on this evidence, the Court is convinced that the claims of members of the class all depend on the answer to the common question of whether Defendants' interdiction program targeted members of racial and ethnic minorities for selective enforcement of the traffic laws in violation of the Equal Protection Clause of the Fourteenth Amendment. *See Wal-Mart*, 131 S.Ct. at 2554. The Court is also convinced that a classwide proceeding on this issues will "generate common answers apt to drive the resolution of the litigation" because the answer to this question will conclusively establish whether Tenaha's interdiction program is discriminatory and, thus, whether an injunction putting an end to Tenaha's interdiction program is warranted *Id*. at 2551.

Accordingly, the Court finds that the commonality requirement is met.

### c) Typicality

Under the typicality requirement, the named plaintiffs must demonstrate that there is sufficient "similarity between [their] legal and remedial theories and the legal and remedial theories of those whom they purport to represent." *Lightbourn v. County of El Paso*, 118 F.3d 421, 426 (5th Cir. 1997). The threshold for demonstrating typicality is low. *Id.* Typicality does not require identity of claims, but only that "the class representative's claims have the same essential characteristics of those of the putative class. If the claims arise from a similar course of conduct and share the same legal theory, factual differences will not defeat typicality." *James v. City of Dallas, Tex.*, 254 F.3d 551, 571 (5th Cir. 2001).

Plaintiffs argue that there is undisputable evidence that proposed class representatives Morrow, Flores, and Parsons were subjected to discriminatory stops under the interdiction in the same manner as the members of the proposed class. As a result, Plaintiffs contend that their claims are typical of those of the proposed class. Plaintiffs also argue that Defendant Washington's testimony that "that's the way we do it" when asked if his treatment of Morrow was typical and Walker's testimony that all citizens subject to the interdiction were treated according to the same rules under the program removes any credible doubt as to typicality. *See* Washington Depo at 193:14-24. The Court agrees.

When Defendant Washington was asked if the treatment of named Plaintiff Morrow was typical of the interdiction program, Washington responded, "That's the way we do it" and described the incident as a "very good example of pretty good police work." Washington Depo at 193:14-24. Similarly, Tenaha City Marshal Walker, who was Tenaha's 30(b)(6) designee regarding the interdiction program, testified that there had been no changes to the interdiction

program and that all citizens were treated according to the same rules under the program. Walker Depo at 45:20-24 and 85:8-12. Although each stop under the interdiction program may have a slightly different factual situation, the evidence indicates that the rules of the interdiction program and the general treatment of individuals stopped as a result of the interdiction program are the same for each stop, including the stops of the proposed class representatives Morrow, Flores, and Parsons. Accordingly, the claims of Morrow, Flores, and Parsons are typical of the claims of the class. Additionally, as discussed above, the Court has drawn an adverse inference on the issue of typicality from the refusal of Defendants Russell and Green to answer questions at their depositions on the issue of typicality. The Court, therefore, finds that the typicality requirement is met.

### d) Adequacy of Representation

Rule 23(a)(4) requires that the representative parties "fairly and adequately protect the interests of the class." FED. R. CIV. P. 23(a)(4). To this end, the adequacy of class representation required under Rule 23(a)(4) mandates an inquiry not only into (1) the "zeal and competence of the representatives' counsel," but also into (2) "the willingness and ability of the representative[s] to take an active role in and control the litigation and to protect the interests of absentees." *Berger v. Compaq Computer Corp.,* 257 F.3d 475, 481 (5th Cir. 2001).

Defendants do not challenge the competence of the proposed class counsel—Stephanie Stephens, David Guillory, and Timothy Garrigan. However, Defendants do argue that appointing three lawyers as co-lead counsel could result in duplication of effort and, thus, would not be in the best interest of the class. The Court is not persuaded by Defendants' argument. The Court has carefully reviewed the evidence of proposed class counsel's training, skill, and experience and finds that each of them is competent to serve as class counsel.

The Court now turns to the second consideration regarding adequacy: the willingness and ability of the representatives to take an active role in and control the litigation and to protect the interests of absentees. Plaintiffs argue that the interests of the proposed class representatives—Morrow, Flores, and Parsons—are identical to those of the proposed class and that there are no conflicts between the class representatives' interests and the interests of the class members. Plaintiffs point out that differences between the proposed representatives and the class do not defeat adequacy unless they rise to the level of conflicts of interest. *See Mullen*, 186 F.3d at 625-26 ("Differences between named plaintiffs and class members render the named plaintiffs inadequate representatives only if those differences create conflicts between the named plaintiffs' interests and the class members' interests"). Additionally, Plaintiffs argue that each of the proposed class representatives has presented a declaration reflecting his support of class certification, his willingness to serve as class representatives, pledging to place the interests of the class above his own, and pledging to cooperate in the prosecution of this case. *See* Declarations of Morrow, Flores, and Parsons, Exhibit 19 to Opening Brief.

Defendants, however, argue that the proposed class representatives will not adequately represent the interests of the parties because they (1) seek to represent a class of persons that apparently do not desire to be a part of this litigation, and (2) seek compensatory and punitive damages on behalf of the class. Defendants argue that seven of the named class members no longer appear to be cooperating in the litigation of the suit. According to Defendants, this suggests that many of the potential class members will also not wish to pursue any claims against Defendants or participate as members of the class. Defendants contend that this creates a conflict of interest with respect to the potential class members because only Morrow, Flores, and Parsons wish to pursue a claim against Defendants. The Court disagrees. At best, Defendants

have provided evidence that some of the original class representatives no longer wish to act as class representatives. Defendants have, however, provided no evidence that these individuals no longer wish to have their claims against Defendants litigated by the remaining class representatives as a class action. Even if Defendants' allegations that several of the original class representatives no longer wish to be class representatives are true, the fact that others are unwilling or unable to act as class representatives has no bearing on the ability or willingness of Morrow, Flores, and Parsons to act as class representatives.

Defendants also argue that the proposed class representatives are inadequate because they are walking a fine line by seeking compensatory and punitive damages. Defendants argue that, on the one hand, seeking monetary relief jeopardizes class certification as a Rule 23(b)(2) class. However, if only injunctive relief is sought, the proposed representatives may subject the class members' potential claims to *res judicata*, and thus create a conflict between their interests and those of the putative class members. The Court is also unpersuaded by this argument. Plaintiffs' request for compensatory and punitive damages reflects their desire to obtain as much relief on behalf of the class as they are legally entitled to and does not affect their adequacy as class representatives or create a conflict of interest. Later in this Order, the Court will more fully address the issue of whether class members' claims for individual damages would be barred by collateral estoppel or *res judicata* should the Court chose to certify only an injunctive class. However, this issue is more appropriately handled in determining whether to certify the class as a (b)(2) class for injunctive relief or a (b)(3) class for damages and does not affect the adequacy of the class representatives.

In conclusion, the differences that Defendants focus on are not the kind of differences that create a conflict of interests between the proposed class representatives and the members of

the class because any differences in the specific factual circumstances giving rise to the claims of the proposed class representatives and the members of the class do not affect the alignment of the class representatives' interests with the interest of the class. *See Mullen*, 186 F.3d at 625-26 (upholding district court's finding of adequacy of representation when the differences in the claims of the class representatives and the potential class members did not affect the alignment of their interests). Accordingly, the Court finds that the proposed class representatives will adequately represent the interests of the entire class.

### 1. Rule 23(b)(2)

Because Plaintiffs are moving for class certification under Rule 23(b)(2), they must also demonstrate "that the party opposing the class has acted or refused to act on grounds generally applicable to the class, thereby making appropriate final injunctive relief or corresponding declaratory relief with respect to the class as a whole." FED. R. CIV. P. 23(b)(2). Rule 23(b)(2) permits class certification of claims seeking injunctive or declaratory relief, and these types of proposed classes need not withstand the Court's independent probe into the superiority of a class action over other available methods of adjudication—i.e., questions of manageability and judicial economy—or the degree to which common issues predominate over those affecting only individual class members. *Allison v. Citgo Petroleum Corp.*, 151 F.3d 402, 414 (5th Cir. 1998); *Forbush*, 994, F.2d at 1105. The key to the (b)(2) class is "the indivisible nature of the injunctive or declaratory remedy warranted—the notion that the conduct is such that it can be enjoined or declared unlawful only as to all of the class members or as to none of them." *Wal-Mart*, 131 S.Ct. at 2557 (quoting Nagareda, 84 N.Y.U.L.Rev., at 132). Accordingly, certification of a Rule 23(b)(2) class is appropriate "only when a single injunction or declaratory judgment would provide relief as to each member of the class." *Wal-Mart*, 131 S.Ct. at 2557. Looking at

the history of Rule 23(b)(2), the *Wal-Mart* Court acknowledged that "'[c]ivil rights cases against parties charged with unlawful, class-based discrimination are prime examples' of what (b)(2) is meant to capture." *Id*. at 2557 (quoting *Amchem Products, Inc. v. Windsor*, 521 U.S. 815, 614 (1997)). Such is the case here.

Here, Plaintiffs allege that Defendants developed an illegal practice that targeted racial minorities for pretextual traffic stops in violation of the Equal Protection Clause of the Fourteenth Amendment—i.e. the interdiction program. When a plaintiff alleges that a defendant is engaged in a "pattern or practice" of behavior, in order to meet the requirements of Rule 23(b)(2), the pattern or practice must "consist of a uniform policy allegedly applied against the plaintiffs, not simply diverse actions in various circumstances." *Bolin*, 231 F.3d at 975 (citing Charles Alan Wright, Arthur R. Miller & Mary Kay Kane, *Federal Practice & Procedure* § 1775 at 448 & n.3 (2nd ed. 1986)). Certification is improper if the merits of the claim turn on the defendant's individual dealings with each plaintiff. *Id*. Plaintiffs have alleged and provided evidence that the interdiction program was uniformly applied and that all citizens affected by the interdiction program were subject to the same rules and procedures. *See* Washington Depo at 193:14-24; Walker Depo at 45:20-24 and 85:8-12. Plaintiffs have also provided evidence that the proportion of racial and ethnic minorities stopped increased dramatically when the interdiction program began and that this increase is statistically significant. *See* Tier 1 Data. Accordingly, the issue to be litigated is whether the interdiction program illegally targeted racial and ethnic minorities for traffic stops, not the individual factual circumstances surrounding each stop. Where plaintiffs allege that the police have engaged in a presumptively invalid procedure, class certification "is appropriate since the liability which the plaintiffs seek to establish is based on the operation itself rather than on the circumstances surrounding each individual stop or

arrest." *Wilson v. Tinicum Township*; 1993 WL 280205, at *8 (E.D. Pa. 1993).  In *Wilson*, the court certified an injunctive class seeking to enjoin the township from continuing to practice its alleged policy of violating the civil rights of individuals by targeting African Americans travelers on I-95 for stops based on pretextual traffic violations and with the intent of searching their vehicles for drugs without probable cause or reasonable suspicion.  *Id.* at *1-7.

Additionally, Rule 23(b)(2) certification is "especially appropriate where a plaintiff seeks injunctive relief against discriminatory practices by a defendant."  *Daniels*, 198 F.R.D. at 414 (citing *Weiss v. York Hosp.*, 745 F.2d 786, 811 (3rd Cir. 1984)); *see also Marisol A. By Forbes v. Giuliani*, 929 F. Supp. 662, 692 (S.D.N.Y. 1996) ("Rule 23(b)(2) is designed to assist and is most commonly relied upon by litigants seeking institutional reform in the form of injunctive relief."), *aff'd*, 126 F.3d 372 (2nd Cir. 1997).  In fact, the 1966 Notes to Rule 23(b)(2) lists civil rights actions "where a party is charged with discriminating unlawfully against a class, usually one whose members are incapable of specific enumeration" as examples of appropriate Rule 23(b)(2) actions.  FED. R. CIV. P. 23(b)(2) 1966 Advisory Committee's Note.  The Supreme Court has also recognized that civil rights cases, like this one, "alleging racial or ethnic discrimination are often by their nature class suits, involving classwide wrongs" and common questions of law or fact are typically present.  *East Texas Motor Freight Systems, Inc. v. Rodriguez*, 431 U.S. 395, 405 (1977).  However, careful attention to the requirements of Federal Rule of Civil Procedure 23 remain, nonetheless, indispensable.  *Id.*

The proposed class, as defined by the Court, alleges classwide racial and ethnic discrimination—i.e. that Defendants' interdiction program unlawfully targeted members of racial and ethnic minorities for stops in violation of the Equal Protection Clause of the Fourteenth Amendment—and is, thus, precisely the type of class for which Rule 23(b)(2) was created.

Accordingly, the Court finds that certification of a (b)(2) class for injunctive and declaratory relief is appropriate.

### a) Class Claims for Declaratory and Injunctive Relief

Plaintiffs request declaratory relief recognizing that

> (1) the Defendants' practice of targeting apparent members of racial or ethnic minority groups for traffic stops, detentions, arrests, searches, and seizures violates the equal protection clause of the Fourteenth Amendment; and

> (2) the Defendants' practice of conducting traffic stops, detentions, arrests, searches, and seizures without legal justification violates the prohibition against unreasonable searches and seizures in the Fourth Amendment, and that resulting forfeitures violate the due process clause of the Fourteenth Amendment.

Plaintiffs also request the following injunctive relief:

> (1) a permanent prohibition against the Defendants' practices found to be unconstitutional; and

> (2) a requirement that these Defendants utilize best practices in conducting any traffic stops, roadside detentions, searches, and seizures that, at a minimum, includes use of video equipment with re-event recording, or comparable features, so that the legal justification for any traffic stop, detention, warrantless arrest, search and/or seizure is accurately recorded, by video and audio, and meaningful monitoring of all such recordings for constitutional compliance.

The proposed class, as modified by the Court, is only concerned with whether the Defendants targeted racial and ethnic minorities for pretextual traffic stops in violation of the Equal Protection Clause of the Fourteenth Amendment, and not with whether any subsequent detentions, arrests, searches, or seizures violated the Fourth Amendment as applied to the states through the Due Process Clause of the Fourteenth Amendment. Accordingly, the specific declaratory and injunctive relief proposed by Plaintiffs is inappropriate to the extent it seeks a declaration or injunction concerning detentions, arrests, searches, or seizures by Defendants. This is not to say that *any* declaratory or injunctive relief is inappropriate on a classwide basis. To the contrary, it only suggests that any declaratory and/or injunctive relief must address

Defendants' alleged practice of targeting members of racial and ethnic minorities for selective enforcement of traffic laws under the interdiction program. As one example, if Plaintiffs prevail on the merits of their case, they would be entitled to a declaration that Defendants' practice of targeting apparent members of racial or ethnic minority groups for pretextual traffic stops violates the equal protection clause of the Fourteenth Amendment. Similarly, they would also be entitled to an injunction putting an end to the interdiction program in Tenaha and prohibiting the Defendants from targeting racial and ethnic minorities for the selective enforcement of traffic laws.

Defendants, however, argue that Plaintiffs proposed injunctive relief is not specific enough. Every order granting an injunction must be specific in its terms and must describe in reasonable detail the act or acts that are enjoined. FED. R. CIV. P. 65(d); *see also Alabama Nursing Home Assoc. v. Harris*, 617 F.2d 385, 387 (5th Cir. 1980). "This requirement of specificity and reasonable detail, based in part on notions of basic fairness, ensures that individuals against whom an injunction is directed receive explicit notice of the precise conduct that is outlawed." *Alabama Nursing Home Assoc.*, 617 F.2d. at 387-88. Citing *Alabama Nursing Home Assoc.*, the Fifth Circuit has stated that the injunctive relief sought under Rule 23(b)(2) must be specific. *Maldanado v. Ochsner Clinic Foundation*, 493 F.3d 521, 524 (5th Cir. 2007). The real issue, however, is not whether Plaintiffs have precisely defined the requested injunction at the class certification state, but whether the class is "sufficiently cohesive that classwide injunctive relief can satisfy the limitations of Federal Rule of Civil Procedure 65(d)—namely, the requirement that it 'state its terms specifically; and describe in reasonable detail . . . the act or acts restrained or required.'" *Shook v. Board of County Commissioners of County of El Paso*, 543 F.3d 597, 604 (10th Cir. 2008) (quoting FED. R. CIV. P. 65(d)). Plaintiffs

are not required to set forth the requested injunction in the pleadings with the specificity required by Rule 65. *Monreal v. Potter*, 367 F.3d 1224, 1236 n.11 (10th Cir. 2004). Plaintiffs have set forth facts suggesting that Defendants' behavior was generally applicable to the class as a whole, making injunctive relief appropriate. The precise terms of the injunction need not be decided at this stage, only that the allegations are such that injunctive and declaratory relief are appropriate and that the class is sufficiently cohesive that an injunction can be crafted that meets the specificity requirements of Rule 65(d).

In *Maldanado*, the Fifth Circuit rejected certification of a Rule 23(b)(2) class for injunctive relief because the inability of the plaintiff to specify what injunctive relief was sought highlighted the fact that individualize issues overwhelmed class cohesiveness. 493 F.3d at 524. The plaintiffs in *Maldanado* were uninsured patients who received medical care from a non-profit hospital and where then billed for their medical services at rates higher than were those patients with health insurance. *Id*. at 523. The plaintiffs sought an injunction requiring, in part, that the hospital provide them with "mutually affordable health care." *Id*. at 524. In denying class certification, the Fifth Circuit pointed out that the plaintiffs had failed to identify any way to determine what a reasonable or "mutually affordable" rate was for the wide variety of medical services offered by the health provider. *Id*. "The amount patients were charged and the amount that is 'reasonable' for the services they received is necessarily an individual inquiry that will depend on the specific circumstances of each class member, the time fame in which care was provided, and both [the defendant's] and other hospitals' costs at that time." *Id*. Unlike the proposed injunction rejected by the Fifth Circuit in *Maldanado*, an injunction in this case would not require an individualized assessment of the injunctive relief afforded to each class member. Instead, the injunction would focus on ending Tenaha's allegedly discriminatory interdiction

program and putting safeguards in place to monitor future stops to make racial profiling less likely.

Additionally, Defendants argue that prospective injunctive relief is not appropriate in this case because Tenaha's interdiction program no longer exists. Defendants point to the deposition testimony of Shelby County's designee, Shelby County Judge Rick Campbell, that Defendant Washington is no longer the Constable of Precinct 4 and that Shelby County no longer operates an interdiction program. *See* Campbell Depo I at 22:14-17; Campbell Depo II at 23:2-17. Mr. Campbell testified that the Shelby County sheriff's office and Precinct 4 have not had an interdiction program since January of 2009. Campbell Depo II at 21:12-17. Although his testimony is somewhat contradictory, Mr. Campbell also indicated that the Shelby County Sherriff's Office does not even do traffic enforcement and does not issue traffic citations. *Id*. at 21:12-23:11. Accordingly, Defendants argue that the members of the class are not subject to any future harm that can be remedied by an injunction. Plaintiffs, however, cite to the deposition testimony of the City of Tenaha's designee, Fred Walker, which was adopted by Shelby County, that the interdiction program was still in place and that no changes had been made to it as of April 21, 2010. Walker Depo at 45:17-24.

Although not labeled as such, Defendants' argument is a mootness argument. According to Defendants, if Tenaha no longer has the allegedly unconstitutional interdiction program, then an action seeking only an injunction to stop the program and a declaration that the program is unconstitutional is moot. However, the fact that Tenaha voluntarily stopped its allegedly unconstitutional interdiction program does not necessarily render classwide injunctive relief moot. A long line of Supreme Court cases stands for the proposition that the "voluntary cessation of allegedly illegal conduct does not deprive the tribunal of power to hear and

determine the case, i.e., does not make the case moot." *United States v. W. T. Grant Co.*, 345 U.S. 629, 632 (1953); *United States v. Trans-Missouri Freight Assn.*, 166 U.S. 290, 308-310 (1897); *Walling v. Helmerich & Payne, Inc.*, 323 U.S. 37, 43 (1944); *Gray v. Sanders*, 372 U.S. 368, 376 (1963); *United States v. Phosphate Export Assn.*, 393 U.S. 199, 202-203 (1968). In such circumstances, a dispute over the legality of the practices at issue remains to be settled by the court. *W.T. Grant Co.*, 345 U.S. at 632. The fact that "the defendant is free to return to his old ways" taken together with the "public interest in having the legality of the practices settled, militates against a mootness conclusion." *Id.* "It is the duty of the courts to beware of efforts to defeat injunctive relief by protestations of repentance and reform, especially when abandonment seems timed to anticipate suit, and there is probability of resumption." *United States v. Oregon State Medical Society*, 343 U.S. 326, 333 (1952). The case may, in fact, be found moot if the defendant can demonstrate that "there is no reasonable expectation that the wrong will be repeated." *T. W. Grant Co.*, 345 U.S. at 633 (quotation and citation omitted). The burden is a "heavy one," and is not satisfied where, as here, the defendants simply claim that the challenged policy no longer exists and they have no intention of reviving it. *Id.*; *see also Hall v. Bd. of Sch. Comm'rs of Conecuh County*, 656 F.2d 999, 1001 (5th Cir. 1981) ("To defeat jurisdiction . . ., defendants must offer more than their mere profession that the conduct has ceased and will not be revived.").[6] Similarly, Defendants' claim that Defendants Washington and Green are no longer employed by the City of Tenaha or Shelby County is not enough to satisfy Defendants'

---

[6] The Eleventh Circuit has held that "[w]hen the defendant is not a private citizen but a government actor, there is a rebuttable presumption that the objectionable behavior will not recur." *Troiana v. Supervisor of Elections in Palm Beach County, Fla.*, 382 F.3d 1276, 1283 (11th Cir. 2004). However, the Fifth Circuit has not adopted this position. In fact, in *Hall v. Board of School Commissioners of Conecuh County*, the Fifth Circuit applied the standard articulated in *W.T. Grant Co.* to determine whether the voluntary cessation of a school policy allowing students to conduct morning devotionals over the school's public address system mooted a constitutional challenge to the policy. 656 F.2d 999, 1000-01 (5th Cir. 1981). In reaching its decision, the Fifth Circuit never indicated that the school board, as a governmental body made up of public officials, was entitled to a rebuttable presumption that the objectionable policy would not recur based on the superintendent's statement that the challenged policy had been terminated. *Id.*

heavy burden of proving that there is no reasonable expectation that the City of Tenaha or Shelby County will reinstate the allegedly discriminatory interdiction program. In *Hall v. Board of School Commissioners of Conecuh County*, the Fifth Circuit found that a suit challenging the constitutionality of a high school's policy of allowing students to give morning devotionals over the school's public address system was not mooted by the school's voluntary decision to discontinue the morning devotionals. 656 F.2d 999, 1000-01 (5th Cir. 1981). In reaching this decision, the court considered the fact that the school board abandoned the policy only after the filing of the lawsuit, and found that "the plaintiffs were entitled to injunctive relief that would be binding upon the [school system], *regardless of changes in personnel*." *Id.* at 1001 (emphasis added).

Overruling Defendants' mootness argument, however, does not answer the question of whether classwide injunctive relief is appropriate. *See W.T. Grant Co.*, 345 U.S. at 633; *United States v. Concentrated Phosphate Export Ass'n*, 393 U.S. 199, 203-04 (1968) (concluding that the case was not moot but noting that the district court was not obligated to grant equitable relief on remand: "Of course it is still open to appellees to show, on remand, that the likelihood of further violations is sufficiently remote to make injunctive relief unnecessary. This is a matter for the trial judge.") (citation omitted); *Sheely v. MRI Radiology Network, P.A.*, 505 F.3d 1173, 1182 n.10 (11th Cir. 2007) (holding that the case was not moot under the doctrine of voluntary cessation, but remanding for trial court to determine whether injunctive relief was appropriate). The analysis of whether a case is moot overlaps with the analysis of whether a permanent injunction is appropriate on the merits because both are concerned with the likelihood of future unlawful conduct. *Sheely*, 505 F.3d at 1182 n. 10. However, the two inquiries are not the same. Whether a permanent injunction is appropriate turns on whether the plaintiff can establish by a

preponderance of the evidence that injunctive relief is necessary. *Id.* (citing *W.T. Grant Co.*, 345 U.S. at 633).

> Along with its power to hear the case, the court's power to grant injunctive relief survives discontinuance of the illegal conduct. The purpose of an injunction is to prevent future violations . . . The necessary determination is that there exists some cognizable danger of recurrent violation, something more than the mere possibility which serves to keep the case alive. . . . To be considered are the bona fides of the expressed intent to comply, the effectiveness of the discontinuance and, in some cases, the character of the past violations.

*Id.*

The evidence is contradictory as to whether the City of Tenaha has, in fact, terminated the interdiction program. Walker, the City of Tenaha's designee, testified that as of the date of his deposition, April 21, 2010, there had been no changes made to the interdiction program and it was still ongoing. Walker Depo at 45:17-24. However, Shelby County offered testimony from its designee, County Judge Rick Campbell, that the sheriff's office has not done interdiction since January 2009. Campbell Depo II at 21:12-20. Additionally, the parties have not pointed to, and the Court has not found, any evidence in the record that the City of Tenaha, Shelby County, or any of the Defendants, have stated that they have no plans to reinstate the interdiction program at some point in the future. All of this, coupled with the egregious allegations that public officials conspired to violate routinely the civil rights of the traveling public, demonstrates to the Court that there exists some cognizable danger of recurrent violation such that injunctive relief is appropriate.

Defendants also argue that even if the interdiction program is still in place, Plaintiffs are not entitled to an injunction because there is no evidence that most of the class members will ever travel through Tenaha in the future and, thus, be subject to the interdiction program. "Rule 23(b)(2) certification is . . . inappropriate when the majority of the class does not face future harm." *Maldonado*, 493 F.3d at 525 (citing *Bolin v. Sears, Roebuck & Co.*, 231 F.3d 970, 978

(5th Cir. 2000)); *see also In re Monumental Life*, 365 F.3d 408, 416 (5th Cir. 2004) ("Of course, certification under rule 23(b)(2) is appropriate only if members of the proposed class would benefit from the injunctive relief they request.").  In *Wal-Mart*, the Supreme Court noted that "the validity of a (b)(2) class depends on whether 'final injunctive relief or corresponding declaratory relief is appropriate respecting the class *as a whole*.'"  *Wal-Mart*, 131 S.Ct. at 2560 (quoting FED. R. CIV. P. 23(b)(2))) (emphasis original to *Wal-Mart*).  Additionally, declaratory relief is improper if it only serves to "facilitate the award of damages."  *Id*.  In *Bolin*, the Fifth Circuit held that the district court abused its discretion by certifying a Rule 23(b)(2) class composed of bankruptcy debtors who alleged that the defendant had employed various unlawful practices to coerce payment of otherwise-discharged pre-bankruptcy debt.  *Bolin*, 231 F.3d at 978-79.  The court held that most of the class members did not face any future harm from the store's collection efforts, so they would have nothing to gain from an injunction.  *Id*.  Because only a negligible proportion of proposed class members were properly seeking injunctive relief, the Fifth Circuit held that rule 23(b)(2) certification was inappropriate.  *Id*. at 978.  In addition, the court found that the declaratory relief sought only served to "facilitate the damages award," and, thus, that monetary damages predominated over the injunctive and declaratory relief sought.  *Id*.

In *Monumental Life*, plaintiffs challenged defendants' practice of charging higher life insurance premiums to African-Americans.  365 F.3d at 411.  Many class members no longer had insurance policies with the defendants, and the exact number of class members who would benefit from an injunction was unknown.  *Id*. at 416.  Defense and plaintiff experts' estimates ranged from eighteen to eighty percent.  Given these estimates, the Fifth Circuit found that "the proportion is sufficient, absent contrary evidence from defendants, that the class as a whole is

deemed properly to be seeking injunctive relief." *Id.* In other words, absent additional evidence, the plaintiffs had sufficiently demonstrated that "most" of the class would likely benefit from injunctive relief. *Id.* However, in *Casa Orlando Apartments, Ltd. v. Federal Nat. Mortg. Ass'n*, the Fifth Circuit found that Rule 23(b)(2) certification was not appropriate when only 40 percent of the proposed class members would benefit from the injunction because they were subject to ongoing harm. 624 F.3d 185, 200 (5th Cir. 2010).

Plaintiffs have provided declarations from class representatives Morrow, Parsons, and Flores stating that they currently avoid traveling through Tenaha and take longer, alternative routes through East Texas. *See* 10/27/10 Declaration of James Morrow ("Morrow Decl."), Exhibit 2 to Second Supplemental Motion for Class Certification ("Second Supplemental Motion") (Dkt. No. 213); October 2, 2010 Declaration of William Parsons ("Parsons Decl."), Exhibit 3 to Second Supplemental Motion; October 2, 2010 Declaration of Javier Flores ("Flores Decl."), Exhibit 4 to Second Supplemental Motion. Additionally, each of the class representatives stated that they expected to need to travel through or near Tenaha in the future. *See* Morrow Dec.; Parsons Dec.; Flores Dec. Plaintiffs argue that this is enough to demonstrate a risk of future harm to the class necessitating injunctive relief. Although none of the parties have provided evidence to suggest what percentage of class members intend to travel in or around Tenaha in the future, the Court is persuaded, given the nature of the allegations, that other class members would react to the alleged treatment in a manner similar to the way in which Morrow, Parsons, Flores reacted. In other words, the Court is convinced that other class members may avoid driving through Tenaha because of their fear of being illegally targeted for stops under the interdiction program. Should the evidence developed in the case indicate that Court is incorrect and that certain members of the proposed class have no intention or desire to travel through

Tenaha in the future, the Court may adjust the class definition to include only those who will be subject to being unconstitutionally targeted for traffic stops in the future. Additionally, because the Court is certifying only a class for injunctive and declaratory relief and not a class for damages, the requested declaratory relief—that the interdiction program illegally targets racial minorities for pretextual traffic stops—would serve as a basis for the requested injunctive relief, not merely as a means to facilitate the award of damages.

Accordingly, the Court finds that classwide declaratory and injunctive relief is appropriate for the class as defined by the Court.

## 1. Class Claims for Monetary Relief

Plaintiffs seek monetary relief in addition to declaratory and injunctive relieve. In *Wal-Mart*, the Supreme Court held that claims for monetary relief may not be certified under Rule 23(b)(2), "at least where (as here) the monetary relief is not incidental to the injunctive or declaratory relief." 131 S.Ct. at 2557. The *Wal–Mart* Court compared Rule 23(b)(2) to (b)(3), concluding that the combination of individualized monetary relief and classwide injunctive or declaratory relief in a (b)(2) class is "inconsistent with the structure of Rule 23(b)." *Wal–Mart*, 131 S.Ct. at 2558. The Court reasoned that a class certified under (b)(2) has "the most traditional justification[ ] for class treatment" because "the relief sought must perforce affect the entire class at once." *Id*. In noting the distinctions between a (b)(2) class and a (b)(3) class, the Court pointed out that (b)(2) class members are not provided with an opportunity to opt-out of the class and may not even be provided notice of the action. *Id*. A class certified under (b)(3), by contrast, "allows class certification in a much wider set of circumstances [than a (b)(3) class] but with greater procedural protections," including notice and opt-out provisions for those potential class members who wish to have their claims heard on an individual basis. *Id*.; *see also*

*Amchem*, 521 U.S. at 615 ("Framed for situations in which class-action treatment is not as clearly called for as it is in Rule 23(b)(1) and (b)(2) situations, Rule 23(b)(3) permits certification where class suit may nevertheless be convenient and desirable") (internal quotations and citation omitted). Thus, *Wal–Mart* held "that individualized monetary claims belong in Rule 23(b)(3)." *Wal-Mart*. 131 S.Ct. at 2558.

In reaching this decision, the Supreme Court overruled, at least in part, Fifth Circuit precedent that claims for monetary relief are permissible in a (b)(2) class so long as injunctive or declaratory relief is the predominant relief sought. In *Allison v. Citgo Petroleum Corp.*, the Fifth Circuit reiterated that "[it], like nearly every other circuit, [has] adopted the position taken by the advisory committee that monetary relief may be obtained in a (b)(2) class action so long as the predominant relief sought is injunctive or declaratory." 151 F.3d at 411. *Allison* also held that "monetary relief predominates in (b)(2) class actions unless it is incidental to requested injunctive or declaratory relief." *Id.* at 415. The Fifth Circuit defined "incidental" monetary damages as those "damages that flow directly from liability to the class as a whole on the claims forming the basis of the injunctive or declaratory relief." *Id.* Such "incidental" damages should at least be capable of computation by means of objective standards and not dependent in any significant way on intangible, subjective differences of each class member's circumstances. *Id.* Finally, the Fifth Circuit reasoned that liability for incidental damages should not require additional hearings to resolve the disparate merits of each individual's case. *Id.* The *Wal-Mart* Court expressly rejected the general statement that monetary damages are recoverable in a (b)(2) class so long as they did not predominate over the injunctive or declaratory relief:

> The mere "predominance" of a proper (b)(2) injunctive claim does nothing to justify elimination of Rule 23(b)(3)'s procedural protections . . . We fail to see why the Rule should be read to nullify these protections whenever a plaintiff

class, at its option, combines its monetary claims with a request—even a "predominant" request'—for an injunction.

131 S.Ct. at 2559. However, in reaching this ruling, the Supreme Court left open the more specific question of whether damages that are merely "incidental" to the injunctive or declaratory relief can be awarded to a 23(b)(2) class as outlined in the Fifth Circuit's decision in *Allison*. *Id*. at 2560 ("we need not decide in this case whether there are any forms of 'incidental' monetary relief that are consistent with the interpretation of Rule 23(b)(2) we have announced and that comply with the Due Process Clause").

The Court need not resolve this open question to reach its decision with respect to Plaintiffs' claims for moneatary relief because these claims cannot satisfy the *Allison* standard. Thus, even if "incidental" monetary relief, as defined in *Allision*, is recoverable in a Rule 23(b)(2) class under *Wal-Mart*, Plaintiffs' request for equitable restitution as well as compensatory and punitive damages is not. Plaintiffs' claims for compensatory and punitive damages would require an individualized, factual determination for each claim and would predominate over the injunctive relief under *Allison*. Thus, Plaintiffs claims for compensatory and punitive damages are not appropriate for Rule 23(b)(2) certification. Additionally, although the Fifth Circuit has held that equitable monetary relief may be compatible with a Rule 23(b)(2) class, Plaintiffs' request for equitable restitution is not tied to the limited (b)(2) class that the Court has defined. *See Monumental*, 365 F.3d at 418 (holding that equitable restitution was appropriate for for (b)(2) class under *Allison*). For example, Plaintiffs request that the Court order that Defendants return any and all seized property and money and reimburse class members for their readily determinable and foreseeable expenses directly flowing from the Defendants' unconstitutional practices, including lawyers' fees, bail expenses, towing and storage fees, and appropriate interest. In general, however, these equitable damages relate to

Plaintiffs' claims that the detentions, arrests, searches, and seizures under the interdiction program violated the Fourth Amendment's prohibition of unreasonable searches and seizures as applied to the states through the due process clause of the Fourteenth Amendment. Because the Court holds that class certification is not appropriate on these grounds, the equitable damages related to these claims are also inappropriate.

### III. *Res Judicata* and Claims for Individual Damages

The briefing of the parties raised the issue of whether certifying a class for injunctive and not monetary relief would effectively destroy any claims for monetary relief held by individual class members. In *Zachary v. Texaco Exploration and Production, Inc*, the Western District of Texas found that the adequacy requirement had not been met when the class representatives dropped their claims for compensatory and punitive damages. 185 F.R.D. 230, 243-44 (W.D. Tex. 1999). Because class members in a (b)(2) class do not have the ability to opt out of the class, the Court found that dropping the punitive damages claims created the possibility that class members would be barred from bringing individual actions for damages based on intentional discrimination. *Id*. Thus, the Court found that the potential class representatives were asking the class members to risk waiving their right to monetary damages solely so the action could proceed as a class action. *Id*. at 244. "The Court is unwilling to risk this result. The decision by the named Plaintiffs to drop the monetary damages claim cannot be imposed upon the absent class members without raising a very serious conflict of interest." *Id*. The concerns of the court in *Zachary* as to the adequacy of the class representatives are not relevant to this case. However, *Zachary* does raise the issue of whether the claims of individual class members for monetary damages may be extinguished if the Court certifies only an injunctive class.

Because the Court has not certified a class for claims regarding detentions, arrests, searches, and seizures under the interdiction program, any individual claims for monetary relief on these grounds will not be foreclosed by the certification of the modified class. However, the tolling of the statute of limitations on those claims will end as of the date of this order. *See Zachary*, 185 F.R.D. at 242 (holding that the period of time between commencement of the proposed class action and the denial is tolled for all putative class members on any subsequent individual lawsuits they may wish to bring) (citing *American Pipe & Constr. Co. v. Utah*, 414 U.S. 538, 552-53 (1975)).[7]

The remaining question, then, is whether *res judicata* would bar any individual claims for monetary damages based on the individual circumstances of a racially motivated stop of a class member. The Court is persuaded that it would not. The issue to be tried in this case is whether Defendants are engaged in a pattern or practice of targeting racial and ethnic minorities for selective enforcement of traffic laws in violation of the equal protection clause of the Fourteenth Amendment. The ruling on this issue should not foreclose an individual lawsuit for damages based on the individual circumstances of a particular stop. Where plaintiffs allege that the police have engaged in a presumptively invalid procedure, class certification "is appropriate since the liability which the plaintiffs seek to establish is based on the operation itself rather than on the circumstances surrounding each individual stop or arrest." *Wilson v. Tinicum Township*; 1993 WL 280205, at *8 (E.D. Pa. 1993). In *Wilson*, the plaintiffs alleged that minorities were targeted for pretextual highway stops so that searches could be requested. *Id*. at * 1. The court certified an injunctive class seeking to enjoin the township from continuing to practice its alleged policy of violating the civil rights of individuals by targeting African Americans travelers on I-95 for

---

[7] The Fifth Circuit has limited this decision with a "no piggyback rule" which restricts the tolling to subsequent individual lawsuits and not further class actions. *See Salazar-Calderon v. Presidio Valley Farmers Assoc.*, 765 F.2d 1334, 1351 (5th Cir. 1985).

stops based on pretextual traffic violations and with the intent of searching their vehicles for drugs without probable cause or reasonable suspicion. *Id*. at *1-7. Similarly, in an action by African-American homeowners who alleged that the city demolished repairable single-family homes in predominately minority neighborhoods without proper notice or judicial warrant, the Fifth Circuit held that the monetary costs that ran against the city for removing liens and clearing the title from the consequences of the allegedly constitutionally deficient no-notice demolition were proper under Rule 23(b)(2) because they flowed directly from the liability to the class as a whole on the claims forming the basis of the injunctive relief. *James v. City of Dallas, Texas*, 254 F.3d 551, 572 (5th Cir. 2001). The court went on to state that "there is no concern that 'the legitimate interests of potential class members who might wish to pursue their monetary [damages] claims individually' would be interfered with by this class certification." *Id*. at 572-73 (quoting *Allison*, 151 F.3d at 415).

Accordingly, the Court is persuaded that any putative class members who wish to pursue individual claims for monetary damages will not be adversely affected by the fact that the Court has chosen to certify a class for injunctive and declaratory relief and not monetary damages.

## IV.     Conclusion

For the reasons discussed above, the Court GRANTS Plaintiffs' Motion for Class Certification and certifies the following class for injunctive and declaratory relief pursuant to Federal Rule of Civil Procedure 23(b)(2):

(1) People who are, or appear to be, members of racial or ethnic minority groups and those in their company, and

(2) Were, or will be, traveling in, through, or near Tenaha at any time after November 1, 2006, and

(3) Were stopped, or will be subject to being stopped, by one or more Defendant for an alleged traffic violation.

IT IS SO ORDERED.

SIGNED this 29th day of August, 2011.

_____
T. JOHN WARD
UNITED STATES DISTRICT JUDGE